# PENNHURST STATE SCHOOL AND HOSPITAL ET AL.
## v. HALDERMAN ET AL.

No. 79–1404. Argued December 8, 1980—Decided April 20, 1981*

---

*Together with No. 79–1408, *Mayor of Philadelphia et al.* v. *Halderman et al.*; No. 79–1414, *Pennsylvania Association for Retarded Citizens et al.* v. *Pennhurst State School and Hospital et al.*; No. 79–1415, *Commissioners and Mental Health/Mental Retardation Administrator for Bucks County et al.* v. *Halderman et al.*; and No 79–1489, *Pennhurst Parents-Staff Assn.* v. *Halderman et al.*, also on certiorari to the same court.

1

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, POWELL, and STEVENS, JJ., joined. BLACKMUN, J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 32. WHITE, J., filed an opinion dissenting in part, in which BRENNAN and MARSHALL, JJ., joined, *post*, p. 33.

*Allen C. Warshaw*, argued the cause for petitioners in No. 79–1404. *Thomas Kittredge* argued the cause for petitioners in Nos. 79–1408 and 79–1415. *Joel I. Klein* argued the cause for petitioner in No. 79–1489. With them on the briefs were *Harvey Bartle III, Robert B. Hoffman, Norman J. Watkins, Alan J. Davis, Carl E. Singley,* and *H. Bartow Farr III.*

*David Ferleger* argued the cause and filed a brief for respondents Halderman et al. *Thomas K. Gilhool* argued the cause for the Pennsylvania Association for Retarded Citizens et al., petitioners in No. 79–1414 and respondents in Nos. 79–1404, 79–1408, 79–1415, and 79–1489. With him on the brief were *Frank J. Laski* and *Michael Churchill. Assistant Attorney General Days* argued the cause for the United States. With him on the brief were *Solicitor General McCree, Harriet S. Shapiro, Brian K. Landsberg, Frank D. Allen, Jr.,* and *Joan Magagna.*†

---

†Briefs of *amici curiae* urging reversal were filed by *Carl R. Ajello,* Attorney General, and *Hugh Barber* and *Francis J. MacGregor,* Assistant Attorneys General, for the State of Connecticut; and by *Michael H. Gottesman* and *Robert M. Weinberg* for Congress of Advocates for the Retarded, Inc., et al.

Briefs of *amici curiae* urging affirmance were filed by *Wm. Reece Smith, Jr.,* for the American Bar Association; by *Margaret F. Ewing* and *Paul R. Friedman* for the American Orthopsychiatric Association et al.; by *Clifford D. Stromberg* for the American Psychiatric Association; by *David S. Tatel* for the International League of Societies for the Mentally Handicapped et al.; by *Robert L. Burgdorf, Jr.,* for the National Association of Protection and Advocacy Systems et al.; by *James D. Crawford* for the National Association for Retarded Citizens et al.; by *Ronald M. Soskin* for the National Center for Law and the Handicapped et al.; by *Deborah Kaplan* and *Steven M. Fleisher* for People First International, Inc., et al.; by *David C. Shaw* for the Connecticut Association for Re-

JUSTICE REHNQUIST delivered the opinion of the Court.

At issue in these cases is the scope and meaning of the Developmentally Disabled Assistance and Bill of Rights Act of 1975, 89 Stat. 486, as amended, 42 U. S. C. § 6000 *et seq.* (1976 ed. and Supp. III). The Court of Appeals for the Third Circuit held that the Act created substantive rights in favor of the mentally retarded, that those rights were judicially enforceable, and that conditions at the Pennhurst State School and Hospital (Pennhurst), a facility for the care and treatment of the mentally retarded, violated those rights. For the reasons stated below, we reverse the decision of the Court of Appeals and remand the cases for further proceedings.

I

The Commonwealth of Pennsylvania owns and operates Pennhurst. Pennhurst is a large institution, housing approximately 1,200 residents. Seventy-five percent of the residents are either "severely" or "profoundly" retarded—that is, with an IQ of less than 35—and a number of the residents

tarded Citizens, Inc., et al.; and by *Steven J. Schwartz* and *Robert D. Fleischner* for Plaintiffs in Brewster *v.* Dukakis (D. Mass.), et al.

A brief for the State of Illinois et al. as *amici curiae* was filed by *Alan E. Grischke* and *Christine A. Bremer,* Special Assistant Attorneys General of Illinois; *Gregorey H. Smith,* Acting Attorney General of New Hampshire, and *Wilbur A. Glahn III* and *Anne R. Clarke,* Assistant Attorneys General; *William J. Guste, Jr.,* Attorney General of Louisiana, and *Carmack M. Blackmon,* Assistant Attorney General; *William J. Brown,* Attorney General of Ohio, and *George Striker,* Assistant Attorney General; *Mark V. Meierhenry,* Attorney General of South Dakota, and *Janice Godtland,* Assistant Attorney General; *Slade Gorton,* Attorney General of Washington, and *David R. Minikel,* Assistant Attorney General; *Chauncey H. Browning,* Attorney General of West Virginia, and *David R. Brisell,* Assistant Attorney General; *Paul L. Douglas,* Attorney General of Nebraska; *John J. Degnan,* Attorney General of New Jersey, and *Steven Wallach,* Deputy Attorney General; *William M. Leech, Jr.,* Attorney General of Tennessee, and *Lee Breckenridge,* Assistant Attorney General; and *Warren A. Spannaus,* Attorney General of Minnesota, and *Alan A. Held,* Special Assistant Attorney General.

6

are also physically handicapped. About half of its residents were committed there by court order and half by a parent or other guardian.

In 1974, respondent Terri Lee Halderman, a minor retarded resident of Pennhurst, filed suit in the District Court for the Eastern District of Pennsylvania on behalf of herself and all other Pennhurst residents against Pennhurst, its superintendent, and various officials of the Commonwealth of Pennsylvania responsible for the operation of Pennhurst (hereafter petitioners). The additional respondents (hereinafter, with respondent Halderman, referred to as respondents) in these cases—other mentally retarded persons, the United States, and the Pennsylvania Association for Retarded Citizens (PARC)—subsequently intervened as plaintiffs. PARC added several surrounding counties as defendants, alleging that they were responsible for the commitment of persons to Pennhurst.

As amended in 1975, the complaint alleged, *inter alia,* that conditions at Pennhurst were unsanitary, inhumane, and dangerous. Specifically, the complaint averred that these conditions denied the class members due process and equal protection of the law in violation of the Fourteenth Amendment, inflicted on them cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments, and denied them certain rights conferred by the Rehabilitation Act of 1973, 87 Stat. 355, as amended, 29 U. S. C. § 701 *et seq.* (1976 ed. and Supp. III), the Developmentally Disabled Assistance and Bill of Rights Act, 42 U. S. C. §§ 6001 *et seq.* (1976 ed. and Supp. III), and the Pennsylvania Mental Health and Mental Retardation Act of 1966, Pa. Stat. Ann., Tit. 50, §§ 4101–4704 (Purdon 1969). In addition to seeking injunctive and monetary relief, the complaint urged that Pennhurst be closed and that "community living arrangements" [1] be established for its residents.

---

[1] "Community living arrangements" are smaller, less isolated residences

The District Court certified a class consisting of all persons who have been or may become residents of Pennhurst. After a 32-day trial, it issued an opinion, reported at 446 F. Supp. 1295 (1977), making findings of fact and conclusions of law with respect to the conditions at Pennhurst. Its findings of fact are undisputed: Conditions at Pennhurst are not only dangerous, with the residents often physically abused or drugged by staff members, but also inadequate for the "habilitation" of the retarded.[2] Indeed, the court found that the physical, intellectual, and emotional skills of some residents have deteriorated at Pennhurst. *Id.*, at 1308–1310.

The District Court went on to hold that the mentally retarded have a federal constitutional right to be provided with "minimally adequate habilitation" in the "least restrictive environment," regardless of whether they were voluntarily or involuntarily committed. *Id.*, at 1314–1320. The court also held that there existed a constitutional right to "be free from harm" under the Eighth Amendment, and to be provided with "nondiscriminatory habilitation" under the Equal Protection Clause. *Id.*, at 1320–1322. In addition, it found that § 504 of the Rehabilitation Act of 1973, 29 U. S. C. § 794, and § 201 of the Pennsylvania Mental Health and Mental Retardation Act of 1966, Pa. Stat. Ann., Tit. 50, § 4201 (Purdon 1969), provided a right to minimally adequate habilitation in the least restrictive environment.

Each of these rights was found to have been violated by the conditions existing at Pennhurst. Indeed, the court held that a large institution such as Pennhurst could not provide adequate habilitation. 446 F. Supp., at 1318. It thus or-

_____

where retarded persons are treated as much as possible like nonretarded persons.

[2] There is a technical difference between "treatment," which applies to curable mental illness, and "habilitation," which consists of education and training for those, such as the mentally retarded, who are not ill. This opinion, like the opinions of the courts below, will use the terms interchangeably.

dered that Pennhurst eventually be closed, that suitable "community living arrangements" be provided for all Pennhurst residents, that plans for the removal of residents from Pennhurst be submitted to the court, that individual treatment plans be developed for each resident with the participation of his or her family, and that conditions at Pennhurst be improved in the interim. The court appointed a Special Master to supervise the implementation of this order. *Id.*, at 1326–1329.

The Court of Appeals for the Third Circuit substantially affirmed the District Court's remedial order. 612 F. 2d 84 (1979) (en banc). Unlike the District Court, however, the Court of Appeals sought to avoid the constitutional claims raised by respondents and instead rested its order on a construction of the Developmentally Disabled Assistance and Bill of Rights Act, 42 U. S. C. § 6000 *et seq.* (1976 ed. and Supp. III).[3] It found that §§ 111 (1) and (2) of the Act, 89 Stat. 502, 42 U. S. C. §§ 6010 (1) and (2), the "bill of rights" provision, grant to mentally retarded persons a right to "appropriate treatment, services, and habilitation" in "the setting that is least restrictive of . . . personal liberty." The

[3] As originally enacted in 1975, the definition of "developmentally disabled" included mental retardation. § 6001 (7) (A) (i). As amended in 1978, however, a mentally retarded individual is considered developmentally disabled only if he satisfies various criteria set forth in the Act.

It is perhaps suggestive of the novelty of the Court of Appeals' decision that none of the respondents briefed the Act before the District Court, nor raised it in the Court of Appeals. Rather, the court itself suggested the applicability of the Act and requested supplemental briefs on the issue for the purpose of rehearing en banc. Even then the United States, which raised only constitutional claims before the District Court, contended merely that the "most significant implication of the Developmentally Disabled Act is the important light which it sheds upon congressional intent about the nature of the rights of institutionalized mentally retarded persons, and the guidance which it may give in discerning a violation of Section 504 [of the Rehabilitation Act]." Supplemental Brief for United States in No. 78–1490 (CA3), p. 2.

court further held that under the test articulated in *Cort* v. *Ash,* 422 U. S. 66, 78 (1975), mentally retarded persons have an implied cause of action to enforce that right. 612 F. 2d, at 97. Because the court found that Congress enacted the statute pursuant to both § 5 of the Fourteenth Amendment [4] and the spending power,[5] it declined to consider whether a statute enacted pursuant to the spending power alone "could ever provide the predicate for private substantive rights." *Id.,* at 98. As an alternative ground, the court affirmed the District Court's holding that Pennhurst residents have a state statutory right to adequate "habilitation."

The court concluded that the conditions at Pennhurst violated these federal and state statutory rights. As to relief, it affirmed the order of the District Court except insofar as it ordered Pennhurst to be closed. Although the court concluded that "deinstitutionalization is the favored approach to habilitation" in the least restrictive environment, it did not construe the Act to require the closing of large institutions like Pennhurst. *Id.,* at 115. The court thus remanded the case to the District Court for "individual determinations by the court, or by the Special Master, as to the appropriateness of an improved Pennhurst for each such patient" and instructed the District Court or the Master to "engage in a presumption in favor of placing individuals in [community living arrangements]." *Id.,* at 114–115.[6]

---

[4] Section 5 of the Fourteenth Amendment provides that "[t]he Congress shall have power to enforce, by appropriate legislation, the provisions of this article."

[5] The spending power is encompassed in Art. I, § 8, cl. 1, of the Constitution, which states that the "Congress shall have the Power To . . . provide for the . . . general Welfare of the United States."

[6] The decisions below are somewhat unclear concerning to whom petitioners owe this right of treatment. The District Court certified a class of all persons who *may* become residents of Pennhurst, and the Court of Appeals directed relief for all *plaintiffs* in the case, including those on Pennhurst's waiting list. Thus, the decisions arguably entitle even those mentally

10

Three judges dissented. Although they assumed that the majority was correct in holding that Pennhurst residents have a right to treatment under the Act and an implied cause of action under the Act to enforce that right, they disagreed that the Act imposed a duty on the defendants to provide the "least restrictive treatment" possible. The dissent stated that "the language and structure of the Act, the relevant regulations, and the legislative history all indicate that the States may consider their own resources in providing less restrictive treatment." *Id.*, at 119. It did not believe that the general findings and declarations contained in a funding statute designed to encourage a course of conduct could be used by the federal courts to create absolute obligations on the States.[7]

We granted certiorari to consider petitioners' several challenges to the decision below. 447 U. S. 904. Petitioners first contend that 42 U. S. C. § 6010 does not create in favor of the mentally retarded any substantive rights to "appropriate treatment" in the "least restrictive" environment. Assuming that Congress did intend to create such a right, petitioners question the authority of Congress to impose these affirmative obligations on the States under either its spending power or § 5 of the Fourteenth Amendment. Petitioners next assert that any rights created by the Act are enforceable in federal court only by the Federal Government, not by private parties.

retarded citizens who are not institutionalized or currently receiving services to a "right to treatment."

[7] The dissent went on to conclude that neither the Federal Constitution, § 504 of the Rehabilitation Act of 1973, nor state law required a State to provide treatment in the "least restrictive setting." The dissent would have thus reversed those portions of the District Court's order that contemplated a court order closing Pennhurst and the creation of new less restrictive facilities. It would also have remanded the case to the District Court for it to decide "how best to bring Pennhurst in compliance with statutory and constitutional requirements" and left open "the possibility that certain individuals in the future may be able to show that their particular mode of treatment is not rationally related to the State's purpose in confining them." 612 F. 2d, at 131.

Finally, petitioners argue that the court below read the scope of any rights created by the Act too broadly and far exceeded its remedial powers in requiring the Commonwealth to move its residents to less restrictive environments and create individual habilitation plans for the mentally retarded. Because we agree with petitioners' first contention—that § 6010 simply does not create substantive rights—we find it unnecessary to address the remaining issues.

## II

We turn first to a brief review of the general structure of the Act. It is a federal-state grant program whereby the Federal Government provides financial assistance to participating States to aid them in creating programs to care for and treat the developmentally disabled. Like other federal-state cooperative programs, the Act is voluntary and the States are given the choice of complying with the conditions set forth in the Act or forgoing the benefits of federal funding. See generally *King* v. *Smith,* 392 U. S. 309 (1968); *Rosado* v. *Wyman,* 397 U. S. 397 (1970); *Harris* v. *McRae,* 448 U. S. 297 (1980). The Commonwealth of Pennsylvania has elected to participate in the program. The Secretary of the Department of Health and Human Services (HHS), the agency responsible for administering the Act, has approved Pennsylvania's state plan and in 1976 disbursed to Pennsylvania approximately $1.6 million. Pennhurst itself receives no federal funds from Pennsylvania's allotment under the Act, though it does receive approximately $6 million per year in Medicaid funds.

The Act begins with an exhaustive statement of purposes. 42 U. S. C. § 6000 (b)(1) (1976 ed., Supp. III). The "overall purpose" of the Act, as amended in 1978, is:

"[*T*]*o assist* [the] states to assure that persons with developmental disabilities receive the care, treatment, and other services necessary to enable them to achieve their

maximum potential through a system which coordinates, monitors, plans, and evaluates those services and which ensures the protection of the legal and human rights of persons with developmental disabilities." (Emphasis supplied.)

As set forth in the margin, the "specific purposes" of the Act are to "assist" and financially "support" various activities necessary to the provision of comprehensive services to the developmentally disabled. § 6000 (b)(2) (1976 ed., Supp. III).[8]

The Act next lists a variety of conditions for the receipt of federal funds. Under § 6005, for example, the Secretary "as a condition of providing assistance" shall require that "each recipient of such assistance take affirmative action" to hire qualified handicapped individuals. Each State, in turn, shall "as a condition" of receiving assistance submit to the Secretary a plan to evaluate the services provided under the Act. § 6009. Each State shall also "as a condition" of receiving assistance "provide the Secretary satisfactory assur-

---

[8] Section 6000 (b)(2) provides:

"The specific purposes of this chapter are—

"(A) to assist in the provision of comprehensive services to persons with developmental disabilities, with priority to those persons whose needs cannot be covered or otherwise met under the Education for All Handicapped Children Act, the Rehabilitation Act of 1973 . . . , or other health, education, or welfare programs;

"(B) to assist States in appropriate planning activities;

"(C) to make grants to States and public and private, nonprofit agencies to establish model programs, to demonstrate innovative habilitation techniques, and to train professional and paraprofessional personnel with respect to providing services to persons with developmental disabilities;

"(D) to make grants to university affiliated facilities to assist them in administering and operating demonstration facilities for the provision of services to persons with developmental disabilities, and interdisciplinary training programs for personnel needed to provide specialized services for these persons; and

"(E) to make grants to support a system in each State to protect the legal and human rights of all persons with developmental disabilities."

ances that each program . . . which receives funds from the State's allotment . . . has in effect for each developmentally disabled person who receives services from or under the program a habilitation plan." § 6011 (a) (1976 ed., Supp. III). And § 6012 (a) (1976 ed., Supp. III) conditions aid on a State's promise to "have in effect a system to protect and advocate the rights of persons with developmental disabilities."

At issue here, of course, is § 6010, the "bill of rights" provision. It states in relevant part:

> "Congress makes the following findings respecting the rights of persons with developmental disabilities:
>
> "(1) Persons with developmental disabilities have a right to appropriate treatment, services, and habilitation for such disabilities.
>
> "(2) The treatment, services, and habilitation for a person with developmental disabilities should be designed to maximize the developmental potential of the person and should be provided in the setting that is least restrictive of the person's personal liberty.
>
> "(3) The Federal Government and the States both have an obligation to assure that public funds are not provided to any institutio[n] . . . that—(A) does not provide treatment, services, and habilitation which is appropriate to the needs of such person; or (B) does not meet the following minimum standards . . . ."

Noticeably absent from § 6010 is any language suggesting that § 6010 is a "condition" for the receipt of federal funding under the Act. Section 6010 thus stands in sharp contrast to §§ 6005, 6009, 6011, and 6012.

The enabling parts of the Act are the funding sections. 42 U. S. C. §§ 6061–6063 (1976 ed. and Supp. III).[9] Those sections describe how funds are to be allotted to the States, re-

---

[9] Sections 6031–6043 authorize separate funding to university-affiliated facilities for the operation of demonstration and training programs and are not pertinent here.

quire that any State desiring financial assistance submit an overall plan satisfactory to the Secretary of HHS, and require that funds disbursed under the Act be used in accordance with the approved state plan. To be approved by the Secretary, the state plan must comply with several specific conditions set forth in § 6063. It, *inter alia,* must provide for the establishment of a State Planning Council, § 6063 (b)(1), and set out specific objectives to be achieved under the plan, § 6063 (b)(2)(A) (1976 ed., Supp. III). Services furnished under the plan must be consistent with standards prescribed by the Secretary, § 6063 (b)(5)(A)(i) (1976 ed., Supp. III), and be provided in an individual manner consistent with § 6011, § 6063 (b)(5)(B) (1976 ed., Supp. III). The plan must also be supported by assurances that any program receiving assistance is protecting the human rights of the disabled consistent with § 6010, § 6063 (b)(5)(C) (1976 ed., Supp. III).[10] Each State must also require its State Planning Council to serve as an advocate of persons with developmental disabilities. § 6067 (1976 ed. and Supp. III).

The Act further provides procedures and sanctions to ensure state compliance with its requirements. The Secretary may, of course, disapprove a state plan, § 6063 (c). If a State fails to satisfy the requirements of § 6063, the Secretary may terminate or reduce the federal grant. § 6065 (1976 ed., Supp. III). Any State dissatisfied with the Secretary's disapproval of the plan, or his decision to terminate funding, may appeal to the federal courts of appeals. § 6068. No other cause of action is recognized in the Act.

---

[10] The provisions of § 6063 were reworded and recodified in 1978. Section 6063 (b)(5)(C) (1976 ed., Supp. III) replaced § 133 (b)(24) of the Act, as added and renumbered, 89 Stat. 491, 506, 42 U. S. C. § 6063 (b)(24), which required a somewhat similar "assurance." The only significant difference between the two provisions is that § 6063 (b)(5)(C) contains a specific reference to § 6010.

## III

As support for its broad remedial order, the Court of Appeals found that 42 U. S. C. § 6010 created substantive rights in favor of the disabled and imposed an obligation on the States to provide, at their own expense, certain kinds of treatment. The initial question before us, then, is one of statutory construction: Did Congress intend in § 6010 to create enforceable rights and obligations?

## A

In discerning congressional intent, we necessarily turn to the possible sources of Congress' power to legislate, namely, Congress' power to enforce the Fourteenth Amendment and its power under the Spending Clause to place conditions on the grant of federal funds. Although the court below held that Congress acted under both powers, the respondents themselves disagree on this point. The Halderman respondents argue that § 6010 was enacted pursuant to § 5 of the Fourteenth Amendment. Accordingly, they assert that § 6010 is mandatory on the States, regardless of their receipt of federal funds. The Solicitor General, in contrast, concedes that Congress acted pursuant to its spending power alone. Tr. of Oral Arg. 54. Thus, in his view, § 6010 only applies to those States which accept federal funds.[11]

Although this Court has previously addressed issues going to Congress' power to secure the guarantees of the Fourteenth Amendment, *Katzenbach* v. *Morgan*, 384 U. S. 641, 651 (1966); *Oregon* v. *Mitchell*, 400 U. S. 112 (1970); *Fitzpatrick*

---

[11] The PARC respondents take a somewhat different view. Although they argue that Congress enacted § 6010 under both § 5 and the spending power, they suggest that § 6010 applies only to programs which receive federal money. The PARC respondents are also cross-petitioners in this litigation, arguing that the Act requires Pennhurst to be closed. In their view, the individual placement decisions required by the court below are not authorized by the Act and, in any event, are an improper exercise of judicial authority.

v. *Bitzer*, 427 U. S. 445 (1975),[12] we have had little occasion to consider the appropriate test for determining when Congress intends to enforce those guarantees. Because such legislation imposes congressional policy on a State involuntarily, and because it often intrudes on traditional state authority, we should not quickly attribute to Congress an unstated intent to act under its authority to enforce the Fourteenth Amendment. Our previous cases are wholly consistent with that view, since Congress in those cases expressly articulated its intent to legislate pursuant to § 5. See *Katzenbach* v. *Morgan, supra* (intent expressly stated in the Voting Rights Act of 1965); *Oregon* v. *Mitchell, supra* (intent expressly stated in the Voting Rights Act Amendments of 1970); *Fitzpatrick* v. *Bitzer, supra* (intent expressly stated in both the House and Senate Reports of the 1972 Amendments to the Civil Rights Act of 1964); cf. *South Carolina* v. *Katzenbach,* 383 U. S. 301 (1966) (intent to enforce the Fifteenth Amendment expressly stated in the Voting Rights Act of 1965). Those cases, moreover, involved statutes which simply prohibited certain kinds of state conduct. The case for inferring intent is at its weakest where, as here, the rights asserted impose *affirmative* obligations on the States to fund certain

---

[12] There is of course a question whether Congress would have the power to create the rights and obligations found by the court below. Although the court below held that "section 6010 does not go beyond what has been judicially declared to be the limits of the [F]ourteenth [A]mendment," 612 F. 2d, at 98, this Court has never found that the involuntarily committed have a constitutional "right to treatment," much less the voluntarily committed. See *Sanchez* v. *New Mexico*, 396 U. S. 276 (1970), dismissing for want of substantial federal question, 80 N. M. 438, 457 P. 2d 370 (1968); *O'Connor* v. *Donaldson*, 422 U. S. 563, 587–589 (1975) (BURGER, C. J., concurring). Thus, the Pennhurst petitioners and several *amici* argue that legislation which purports to create against the States not only a right to treatment, but one in the least restrictive setting, is not "appropriate" legislation within the meaning of § 5. Because we conclude that § 6010 creates no rights whatsoever, we find it unnecessary to consider that question.

services, since we may assume that Congress will not implicitly attempt to impose massive financial obligations on the States.

Turning to Congress' power to legislate pursuant to the spending power, our cases have long recognized that Congress may fix the terms on which it shall disburse federal money to the States. See, e. g., *Oklahoma* v. *CSC*, 330 U. S. 127 (1947); *King* v. *Smith*, 392 U. S. 309 (1968); *Rosado* v. *Wyman*, 397 U. S. 397 (1970). Unlike legislation enacted under § 5, however, legislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions. The legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the "contract." See *Steward Machine Co.* v. *Davis*, 301 U. S. 548, 585–598 (1937); *Harris* v. *McRae*, 448 U. S. 297 (1980). There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it. Accordingly, if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously.[13] Cf. *Employees* v. *Department of Public Health and Welfare*, 411 U. S. 279, 285 (1973); *Edelman* v. *Jordan*, 415 U. S. 651 (1974). By insisting that Congress speak with a clear voice, we enable the States to exercise their choice knowingly, cognizant of the consequences of their participation.

Indeed, in those instances where Congress has intended the States to fund certain entitlements as a condition of receiving

---

[13] There are limits on the power of Congress to impose conditions on the States pursuant to its spending power, *Steward Machine Co.* v. *Davis*, 301 U. S., at 585; *Lau* v. *Nichols*, 414 U. S. 563, 569 (1974); *Fullilove* v. *Klutznick*, 448 U. S. 448 (1980) (BURGER, C. J.); see *National League of Cities* v. *Usery*, 426 U. S. 833 (1976). Even the Halderman respondents, like the court below, recognize the "constitutional difficulties" with imposing affirmative obligations on the States pursuant to the spending power, Tr. of Oral Arg. 45. That issue, however, is not now before us.

federal funds, it has proved capable of saying so explicitly. See, *e. g., King* v. *Smith, supra,* at 333 (Social Security Act creates a "federally imposed obligation [on the States] to furnish 'aid to families with dependent children . . . with reasonable promptness to all eligible individuals,' " quoting the Act). We must carefully inquire, then, whether Congress in § 6010 imposed an obligation on the States to spend state money to fund certain rights as a condition of receiving federal moneys under the Act or whether it spoke merely in precatory terms.

## B

Applying those principles to these cases, we find nothing in the Act or its legislative history to suggest that Congress intended to require the States to assume the high cost of providing "appropriate treatment" in the "least restrictive environment" to their mentally retarded citizens.

There is virtually no support for the lower court's conclusion that Congress created rights and obligations pursuant to its power to enforce the Fourteenth Amendment. The Act nowhere states that that is its purpose. Quite the contrary, the Act's language and structure demonstrate that it is a mere federal-state funding statute. The explicit purposes of the Act are simply "to assist" the States through the use of federal grants to improve the care and treatment of the mentally retarded. § 6000 (b) (1976 ed., Supp. III). Nothing in either the "overall" or "specific" purposes of the Act reveals an intent to require the States to fund new, substantive rights. Surely Congress would not have established such elaborate funding incentives had it simply intended to impose absolute obligations on the States.

Respondents nonetheless insist that the fact that § 6010 speaks in terms of "rights" supports their view. Their reliance is misplaced. " 'In expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy.' " *Philbrook* v. *Glodgett,* 421 U. S. 707, 713 (1975),

quoting *United States* v. *Heirs of Boisdoré,* 8 How. 113, 122 (1849). See *District of Columbia* v. *Carter,* 409 U. S. 418, 420 (1973). Contrary to respondents' assertion, the specific language and the legislative history of § 6010 are ambiguous. We are persuaded that § 6010, when read in the context of other more specific provisions of the Act, does no more than express a congressional preference for certain kinds of treatment. It is simply a general statement of "findings" and, as such, is too thin a reed to support the rights and obligations read into it by the court below. The closest one can come in giving § 6010 meaning is that it justifies and supports Congress' appropriation of money under the Act and guides the Secretary in his review of state applications for federal funds. See *United States* v. *Carolene Products Co.,* 304 U. S. 144, 152 (1938).[14] As this Court recognized in *Rosado* v. *Wyman, supra,* at 413, "Congress sometimes legislates by innuendo, making declarations of policy and indicating a preference while requiring measures that, though falling short of legislating its goal, serve as a nudge in the preferred directions." This is such a case.

---

[14] Respondents also contend that the title of the Act as passed, rather than as codified, reveals an intent to create rights in favor of the disabled. Pub. L. 94–103, 89 Stat. 486. As passed, the Act contained three Titles. Title I provided for services and facilities to the developmentally disabled and Title II, entitled "The Establishment and Protection of the Rights of Persons with Developmental Disabilities," contained § 6010. Respondents' reliance on this title is misplaced. It has long been established that the title of an Act "cannot enlarge or confer powers." *United States* v. *Oregon & California R. Co.,* 164 U. S. 526, 541 (1896); *Cornell* v. *Coyne,* 192 U. S. 418, 430 (1904). See *United States* v. *Fisher,* 2 Cranch 358, 386 (1805); *Yazoo & Mississippi Valley R. Co.* v. *Thomas,* 132 U. S. 174, 188 (1889). In addition, the location of § 6010 in the Act as passed confirms § 6010's limited meaning. Section 6010 was the preamble of Title II followed by provisions later codified as §§ 6009, 6011, 6012. The congressional findings in § 6010 thus seem to have been designed simply to serve as the rationale for the conditions imposed in the remaining sections of Title II.

The legislative history buttresses our conclusion that Congress intended to encourage, rather than mandate, the provision of better services to the developmentally disabled. The House Committee believed the purpose of the Act was simply to continue an existing federal grant program, designed to promote "effective planning by the states of their programs, initiation of new, needed programs, and filling of gaps among existing efforts." H. R. Rep. No. 94–58, pp. 6, 8–9 (1975). Indeed, as passed by the House, the Act contained no "bill of rights" provision whatsoever. The Committee instead merely "applauded" the efforts of others to secure rights for the developmentally disabled. *Id.*, at 7.

Respondents, however, argue vigorously that the legislative history of the bill as passed by the Senate evinces Congress' intent to impose absolute obligations on the States to fund certain levels of treatment. Respondents rely most heavily on Title II of the Senate bill which adopted a "Bill of Rights" for the mentally retarded and contained over 400 pages of detailed standards "designed to assist in the protection of the human rights guaranteed under the Constitution." S. Rep. No. 94–160, p. 34 (1975). The Report also noted that the "Federal Government has a responsibility to provide equal protection under the law to all citizens." *Id.*, at 32. And Senator Stafford stated on the Senate floor that "Title II was added to the bill to assist in the protection of the rights guaranteed under our Constitution for those individuals that will require institutionalization." 121 Cong. Rec. 16516 (1975).

Respondents read too much into these scattered bits of legislative history. In the first place, it is by no means clear that even the Senate bill created new substantive rights in favor of the disabled.[15] Despite the general discussion of

---

[15] As originally passed by the Senate, for example, the bill provided that a State which failed to comply with the detailed standards of care enumerated in Title II would lose all federal funding, including that provided

equal protection guarantees in the Senate Report, the Committee's view of the Act was quite modest. It explained that the purpose of Title II was simply "to stimulate the States to develop alternative programs of care for mentally retarded." S. Rep. No. 94–160, *supra,* at 1. It viewed Title II as satisfying the "need for a clear exposition of the purposes for which support should be provided under the authorities of the Act." *Id.,* at 3. Nor are the remarks of various Senators to the contrary. Senator Stafford spoke merely in terms of "assisting" the States. Senator Randolph, in introducing the bill on the floor of the Senate, confirmed the Senate's limited purpose. He said:

> "[W]e have developed a bill whose thrust, like the 1970 act, is *to assist* States in developing a comprehensive plan to bring together available resources in a coordinated way so developmentally disabled individuals are appropriately served. Our goal is more thorough and careful planning and more effective evaluation." 121 Cong. Rec. 16514 (1975) (emphasis supplied).

Even Senator Javits, the principal proponent of Title II, did not read the Act as establishing new substantive rights to enforce those guaranteed by the Constitution. He explained that Title II "represents a *reaffirmation* of the basic human and civil rights of all citizens. It offers the *direction* to provide a valid and realistic *framework* for improving the overall situation of this country's mentally retarded and other developmentally disabled individuals." *Id.,* at 16519 (emphasis supplied).

In any event, whatever the Senate's view of its bill, Congress declined to adopt it. The Conference Committee rejected the explicit standards of Title II and instead com-

---

under such programs as Medicaid. S. 462, Tit. II, § 206. See S. Rep. No. 94–160, p. 35 (1975). The fact that the Senate would include a *funding* sanction is, of course, wholly inconsistent with respondents' argument that Congress was acting pursuant to § 5 of the Fourteenth Amendment.

promised on the more general statement of "findings" in what later became § 6010. H. R. Conf. Rep. No. 94–473, pp. 41, 43 (1975). As Senator Javits noted with respect to the compromise, "Title II of the Conference agreement establishes a *clear Federal policy* that the mentally retarded have a right to appropriate treatment, services, and habilitation." 121 Cong. Rec. 29820 (1975) (emphasis supplied).

In sum, nothing suggests that Congress intended the Act to be something other than a typical funding statute.[16] Far from requiring the States to fund newly declared individual rights, the Act has a systematic focus, seeking to improve care to individuals by encouraging better state planning, coordination, and demonstration projects. Much like the Medicaid statute considered in *Harris* v. *McRae,* 448 U. S. 297 (1980), the Act at issue here "was designed as a cooperative program of shared responsibilit[ies], not as a device for the Federal Government to compel a State to provide services that Congress itself is unwilling to fund." *Id.,* at 309.

There remains the contention of the Solicitor General that Congress, acting pursuant to its spending power, conditioned the grant of federal money on the State's agreeing to underwrite the obligations the Court of Appeals read into § 6010. We find that contention wholly without merit. As amply demonstrated above, the "findings" in § 6010, when viewed

---

[16] Nor is the contrary proved by a 1978 amendment to § 6010 which provides:

"The rights of persons with developmental disabilities described in findings made in this section are in addition to any constitutional or other rights otherwise afforded to all persons." 92 Stat. 3007.

This provision, adopted in Conference Committee without any legislative history, merely expresses Congress' view that persons with developmental disabilities have rights in addition to those generally available to "all persons." The section recognizes that Congress only "described" rights, not created them. Nothing in the language supports an inference of substantive duties from a statement of congressional policy.

in the context of the more specific provisions of the Act, represent general statements of federal policy, not newly created legal duties.

The "plain language" of § 6010 also refutes the Solicitor General's contention. When Congress intended to impose conditions on the grant of federal funds, as in §§ 6005, 6009, 6011, 6012, 6063, and 6067, it proved capable of doing so in clear terms. Section 6010, in marked contrast, in no way suggests that the grant of federal funds is "conditioned" on a State's funding the rights described therein. The existence of explicit conditions throughout the Act, and the absence of conditional language in § 6010, manifest the limited meaning of § 6010.

Equally telling is the fact that the Secretary has specifically rejected the position of the Solicitor General. The purpose of the Act, according to the Secretary, is merely "to improve and coordinate the provision of services to persons with developmental disabilities." 45 CFR § 1385.1 (1979). The Secretary acknowledges that "[n]o authority was included in [the 1975] Act to allow the Department to withhold funds from States on the basis of failure to meet the findings [of § 6010]." 45 Fed. Reg. 31006 (1980). If funds cannot be terminated for a State's failure to comply with § 6010, § 6010 can hardly be considered a "condition" of the grant of federal funds.[17] The Secretary's interpretation of § 6010, moreover, is well supported by the legislative history. In reaching

---

[17] To be sure, the Secretary has read the 1978 recodification of § 6063 (b) (5) (C) (1976 ed., Supp. III) to require a participating State to assure the Secretary that services in funded programs are being provided consistent with § 6010. 45 Fed. Reg. 31006 (1980). But, as will be discussed *infra*, even if the Secretary's interpretation of the 1978 recodification is correct, a participating State's obligations under § 6063 (b) (5) (C) are far more modest than the obligations read into § 6010 by the court below and urged by the Solicitor General here. It is also important to note that the Secretary, despite his apparent authority to do so, has not terminated funds to Pennsylvania for noncompliance with § 6063 (b) (5) (C).

the compromise on § 6010, the Conference Committee rejected the Senate's proposal to terminate federal funding of States which failed to comply with the standards enumerated in Title II of the Senate's bill, see n. 15, *supra*. By eliminating that sanction, Congress made clear that the provisions of § 6010 were intended to be hortatory, not mandatory.[18]

The fact that Congress granted to Pennsylvania only $1.6 million in 1976, a sum woefully inadequate to meet the enormous financial burden of providing "appropriate" treatment in the "least restrictive" setting, confirms that Congress must have had a limited purpose in enacting § 6010. When Congress does impose affirmative obligations on the States, it usually makes a far more substantial contribution to defray costs. *Harris* v. *McRae, supra*. It defies common sense, in short, to suppose that Congress implicitly imposed this massive obligation on participating States.

Our conclusion is also buttressed by the rule of statutory construction established above, that Congress must express clearly its intent to impose conditions on the grant of federal funds so that the States can knowingly decide whether or not to accept those funds. That canon applies with greatest force where, as here, a State's potential obligations under the Act are largely indeterminate. It is difficult to know what

---

[18] The Solicitor General also relies heavily on § 6010 (3), quoted *supra*, at 13. He apparently contends that Congress in § 6010 (3) conditioned the grant of all federal funds, including Medicaid, on the participating State's agreement to provide adequate treatment to individuals. Although § 6010 (3), unlike §§ 6010 (1) and (2), at least speaks in terms of "obligations," we find the Solicitor General's argument ultimately without merit. First, like the other "findings" in § 6010, § 6010 (3) is merely an expression of federal *policy*. As even the Secretary concedes, Congress did not give the Secretary authority to withdraw federal funds on the basis of a State's failure to comply with § 6010 (3). Second, by its terms, § 6010 (3) states that both the Federal Government and the States should not spend public money for substandard *institutions*. Nothing reveals an intent to condition the grant of federal funds under the Act on the State's promise to provide appropriate habilitation to *individuals*.

is meant by providing "appropriate treatment" in the "least restrictive" setting, and it is unlikely that a State would have accepted federal funds had it known it would be bound to provide such treatment. The crucial inquiry, however, is not whether a State would knowingly undertake that obligation, but whether Congress spoke so clearly that we can fairly say that the State could make an informed choice. In this case, Congress fell well short of providing clear notice to the States that they, by accepting funds under the Act, would indeed be obligated to comply with § 6010. Not only does § 6010 lack conditional language, but it strains credulity to argue that participating States should have known of their "obligations" under § 6010 when the Secretary of HHS, the governmental agency responsible for the administration of the Act and the agency with which the participating States have the most contact, has never understood § 6010 to impose conditions on participating States. Though Congress' power to legislate under the spending power is broad, it does not include surprising participating States with postacceptance or "retroactive" conditions.

Finally, a brief comparison of the general language of § 6010 with the conditions Congress explicitly imposed on the States demonstrates that Congress did not intend to place either absolute or conditional obligations on the States. The Court of Appeals, for example, read § 6010 to impose an obligation to provide habilitation plans for all developmentally disabled persons. But Congress required habilitation plans under § 6011 "only when the Federal assistance under the Act contributes a portion of the cost of the habilitation services to the developmentally disabled person." H. R. Conf. Rep. No. 94–473, p. 43 (1975). If the Court of Appeals were correct, of course, there would be no purpose for Congress to have required habilitation plans at all, or to have limited the requirement to certain programs, since such plans automatically would have been mandated in all programs by the more inclusive requirements of § 6010.

Second, the specific condition imposed in § 6063 (b)(5)(C) (1976 ed., Supp. III) requires each state plan to

"contain or be supported by assurances satisfactory to the Secretary that the human rights of all persons with developmental disabilities . . . who are receiving treatment, services, or habilitation, under programs assisted under this chapter will be protected consistent with section 6010 of this title (relating to rights of the developmentally disabled)."

Once again, these limitations—both as to programs assisted under the Act and as to affording protection in a manner that is "consistent with § 6010"—would be unnecessary if, as the court below ruled, all state programs were required to fund the rights described in § 6010.

And third, the court below held that § 6010 mandated deinstitutionalization for most, if not all, mentally retarded persons. As originally enacted in 1975, however, the Act required only that each State use not less than 30 percent of its allotment "for the purpose of assisting it in developing and implementing plans designed to eliminate inappropriate placement in institutions of persons with developmental disabilities." § 6062 (a)(4).[19] Three years later, Congress relieved the States of even that modest duty. Instead of requiring the States to use a certain portion of their allotment to support deinstitutionalization, Congress required the States to concentrate their efforts in at least one of four areas, only one of which was "community living arrangements." § 6063 (b)(4)(A)(ii) (1976 ed., Supp. III). Had § 6010 created a right to deinstitutionalization, the policy choices con-

---

[19] The House Report, for example, explained that States were required only to plan "for as much deinstitutionalization as is feasible," recognizing that this requirement would "prompt some movement of patients from State institutions back into their communities." H. R. Rep. No. 94-58, p. 10 (1975).

templated by both the 1975 and 1978 provisions would be meaningless.

In sum, the court below failed to recognize the well-settled distinction between congressional "encouragement" of state programs and the imposition of binding obligations on the States. *Harris* v. *McRae,* 448 U. S. 297 (1980). Relying on that distinction, this Court in *Southeastern Community College* v. *Davis,* 442 U. S. 397 (1979), rejected a claim that § 504 of the Rehabilitation Act of 1973, which bars discrimination against handicapped persons in federally funded programs, obligates schools to take affirmative steps to eliminate problems raised by an applicant's hearing disability. Finding that "state agencies such as Southeastern are only 'encourage[d] . . . to adopt and implement such policies and procedures,' " *id.,* at 410 (quoting the Act), we stressed that "Congress understood [that] accommodation of the needs of handicapped individuals may require affirmative action and knew how to provide for it in those instances where it wished to do so." *Id.,* at 411. Likewise in this case, Congress was aware of the need of developmentally disabled persons and plainly understood the difference, financial and otherwise, between encouraging a specified type of treatment and mandating it.

## IV

Respondents also suggest that they may bring suit to compel compliance with those conditions which *are* contained in the Act. Of particular relevance to these cases are § 6011 (a) (1976 ed., Supp. III) and § 6063 (b)(5)(C) (1976 ed., Supp. III), which are quoted *supra,* at 12–13, 26.[20]

That claim raises several issues. First, it must be determined whether respondents have a private cause of action

---

[20] The Court of Appeals was apparently aware of these conditions since it referred expressly to § 6063 (b)(5)(C) in concluding that § 6010 creates a right to treatment. Its error was in bypassing these specific conditions and resting its decision on the more general language of § 6010.

to compel state compliance with those conditions.[21]    In legislation enacted pursuant to the spending power, the typical remedy for state noncompliance with federally imposed conditions is not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the State. See § 6065 (1976 ed., Supp. III). Just last Term, however, in *Maine* v. *Thiboutot,* 448 U. S. 1 (1980), we held that 42 U. S. C. § 1983 provides a cause of action for state deprivations of "rights secured" by "the laws" of the United States. See 448 U. S., at 4. Whether *Thiboutot* controls these cases depends on two factors. First, respondents here, unlike the plaintiffs in *Thiboutot,* who alleged that state law prevented them from receiving federal funds to which they were entitled, can only claim that the state plan has not provided adequate "assurances" to the Secretary. It is at least an open question whether an individual's interest in having a State provide those "assurances" is a "right secured" by the laws of the United States within the meaning of § 1983. Second, JUSTICE POWELL in dissent in *Thiboutot* suggested that § 1983 would not be available where the "governing statute provides an exclusive remedy for violations of its terms." *Id.,* at 22, n. 11. It is unclear whether the express remedy contained in this Act is exclusive.

Second, it is not at all clear that the Pennhurst petitioners have violated § 6011 and § 6063 (b)(5)(C) (1976 ed. and Supp. III). Those sections, by their terms, only refer to "programs assisted" under the Act. Because Pennhurst does not receive federal funds under the Act, it is arguably not a "program assisted." Thus, there may be no obligation on the State under § 6011 to assure the Secretary that each resident of Pennhurst have a habilitation plan, or assure the Secretary

---

[21] Because we conclude that § 6010 confers no substantive rights, we need not reach the question whether there is a private cause of action under that section or under 42 U. S. C. § 1983 to enforce those rights. See *Southeastern Community College* v. *Davis,* 442 U. S. 397, 404, n. 5 (1979).

under § 6063 (b)(5)(C) that Pennhurst residents are being provided services consistent with § 6010.[22]

Third, there is the question of remedy. Respondents' relief may well be limited to enjoining the Federal Government from providing funds to the Commonwealth. As we stated in *Rosado* v. *Wyman,* 397 U. S., at 420, welfare claimants were "entitled to declaratory relief and an appropriate injunction by the District Court against the payment of *federal* monies . . . should the State not develop a conforming plan within a reasonable period of time." (Emphasis in original.) There, we rejected the suggestion that the courts could require the State to pay the additional sums demanded by compliance with federal standards. Relying on *King* v. *Smith,* 392 U. S. 309 (1968), we explained that "the State had alternative choices of assuming the additional cost" of complying with the federal standard "or not using federal funds." 397 U. S., at 420–421. Accordingly, we remanded the case so that the State could exercise that choice.

In other instances, however, we have implicitly departed from that rule and have affirmed lower court decisions enjoining a State from enforcing any provisions which conflict with federal law in violation of the Supremacy Clause, *e. g., Carleson* v. *Remillard,* 406 U. S. 598 (1972). In still other cases, we have struck down state laws without addressing the form of relief, *e. g., Townsend* v. *Swank,* 404 U..S. 282 (1971). In no case, however, have we required a State to provide money to plaintiffs, much less required a State to take on such open-ended and potentially burdensome obligations as providing "appropriate" treatment in the "least restrictive" environment. And because this is a suit in federal court, anything

---

[22] JUSTICE WHITE concedes that Pennsylvania may not have violated § 6011, since Pennhurst may not be a "program assisted" under the Act. *Post,* at 41–42, n. 7. Curiously, however, he simultaneously assumes that § 6063 (b)(5)(C) applies to Pennhurst. *Post,* at 41. Because both § 6011 and § 6063 (b)(5)(C) apply only to "programs assisted," I do not understand why § 6063 (b)(5)(C), but not § 6011, is applicable.

but prospective relief would pose serious questions under the Eleventh Amendment. *Edelman* v. *Jordan,* 415 U. S. 651 (1974).[23]

These are all difficult questions. Because the Court of Appeals has not addressed these issues, however, we remand the issues for consideration in light of our decision here.

## V

After finding that federal law imposed an obligation on the States to provide treatment, the court below examined state law and found that it too imposed such a requirement. 612 F. 2d, at 100–103. The court looked to § 4201 of the Pennsylvania Mental Health and Mental Retardation Act of 1966, which provides in pertinent part:

"The department of [Public Welfare] shall have power, and its duty shall be:

"(1) To assure within the State the availability and equitable provision of adequate mental health and mental retardation services for all persons who need them, regardless of religion, race, color, national origin, settlement, residence, or economic or social status." Pa. Stat. Ann., Tit. 50, § 4201 (Purdon 1969).

Respondents contend that, even if we conclude that relief is unavailable under federal law, state law adequately supports the relief ordered by the Court of Appeals. There are,

---

[23] We do not significantly differ with our Brother WHITE on the remedy for failure to comply with federally imposed conditions. Relying on *Rosado* v. *Wyman,* he argues that Pennsylvania should be given the option of rejecting federal funds under the Act or complying with § 6010. If we agreed that § 6010 was a condition on the grant of federal funds, we would have little difficulty subscribing to that view. We differ only in that he believes that § 6010 imposes conditions on participating States while we believe that the relevant conditions to these cases are §§ 6011 and 6063 (b)(5)(C). If the court on remand determines that there has been a violation of those conditions, it may well be appropriate to apply the principles announced in *Rosado,* as JUSTICE WHITE suggests.

however, two difficulties with that argument. First, the lower court's finding that state law provides a right to treatment may well have been colored by its holding with respect to § 6010. Second, the court held only that there is a right to "treatment," not that there is a state right to treatment in the "least restrictive" environment. As such, it is unclear whether state law provides an independent and adequate ground which can support the court's remedial order. Accordingly, we remand the state-law issue for reconsideration in light of our decision here.[24]

For similar reasons, we also remand to the Court of Appeals those issues it did not address, namely, respondents' federal constitutional claims and their claims under § 504 of the Rehabilitation Act.

## VI

Congress in recent years has enacted several laws designed to improve the way in which this Nation treats the mentally retarded.[25] The Developmentally Disabled Assistance and Bill of Rights Act is one such law. It establishes a national policy to provide better care and treatment to the retarded and creates funding incentives to induce the States to do so. But the Act does no more than that. We would be attribut-

---

[24] Respondents have submitted to the Court 10 photocopies of a recent decision of the Pennsylvania Supreme Court which they characterize as holding that Pennsylvania state law provides a right to "state-funded individualized habilitation services." *In re Schmidt*, 494 Pa. 86, 429 A. 2d 631 (1981). The late submission not only fails to comply with Supreme Court Rule 35.5, it does not affect our decision here. On remand following our reversal, the Court of Appeals will be in a position to consider the state-law issues in light of the Pennsylvania's Supreme Court's recent decision.

[25] *E. g.*, The Rehabilitation Act of 1973, as amended in 1974 and 1978, 29 U. S. C. § 701 *et seq.* (1976 ed. and Supp. III); The Education for All Handicapped Children Act of 1975, 20 U. S. C. §§ 1401–1420; Social Security Amendments of 1974, 42 U. S. C. §§ 1396d (d) and 1397; Community Mental Health Centers Act, 42 U. S. C. § 2689 *et seq.*

ing far too much to Congress if we held that it required the States, at their own expense, to provide certain kinds of treatment. Accordingly, we reverse the principal holding of the Court of Appeals and remand for further proceedings consistent with this opinion.

*Reversed and remanded.*

JUSTICE BLACKMUN, concurring in part and concurring in the judgment.

Although I agree that the judgment of the Court of Appeals must be reversed, and although I am in accord with much of what the Court says about the meaning of this confused and confusing legislation, see *ante,* at 11–27, I do not join the Court's advisory discussion in Part IV of its opinion. In that Part, the Court properly and correctly notes, *ante,* at 30, that it leaves open for consideration on remand whether, and in what form, §§ 6011 and 6063 create rights that are enforceable by private parties like those that make up these plaintiff classes. The Court, however, seems to me strongly to intimate that it will not view kindly any future positive holding in that direction. I agree that this specific question was not presented and is not today decided, but I decline to join what appears to be a negative attitude on the part of the Court to what is a possible construction of the Act.

It seems plain to me that Congress, in enacting § 6010, intended to do more than merely set out politically self-serving but essentially meaningless language about what the developmentally disabled deserve at the hands of state and federal authorities. A perfectly reasonable judicial interpretation of § 6010, which would avoid the odd and perhaps dangerous precedent of ascribing no meaning to a congressional enactment, would observe and give effect to the linkage between § 6010 and § 6063. As the Court points out, *ante,* at 12, a State that accepts funds under the Act becomes legally obligated to submit a state plan containing "assur-

ances satisfactory to the Secretary that the human rights of all persons with developmental disabilities . . . who are receiving treatment, services, or habilitation under programs assisted under this chapter will be protected consistent with section 6010 . . . ." 42 U. S. C. § 6063 (b)(5)(C) (1976 ed., Supp. III).

That private parties, the intended beneficiaries of the Act, should have the power to enforce the modest legal content of § 6063 would not be an unusual application of our precedents, even for a legislative scheme that involves federal regulatory supervision of state operations See, e. g., *Cannon* v. *University of Chicago,* 441 U. S. 677 (1979); *Rosado* v. *Wyman,* 397 U. S. 397 (1970). See also *Maine* v. *Thiboutot,* 448 U. S. 1 (1980).

Finally, I have difficulty with the Court's suggestion, *ante,* at 28–29, that Pennhurst should be free of the Act's requirements because it does not directly receive funds under the Act. The Commonwealth's program for the institutionalized developmentally disabled is unified in one administration. To restrict the definition of "program assisted" in § 6063 to specific institutions within a unified program would allow a State to insulate substandard institutions from federal requirements merely by allocating federal funds to acceptable premises and state funds to substandard ones.

JUSTICE WHITE, with whom JUSTICE BRENNAN and JUSTICE MARSHALL join, dissenting in part.

Pennhurst is a residential institution for the retarded operated by the Commonwealth of Pennsylvania and serving a five-county area. Roughly half of its 1,200 residents were admitted upon application of their parents or guardians while the remainder were committed pursuant to court order. After extensive discovery and a lengthy trial, the District Court held that the conditions of confinement at Pennhurst violated the rights of its residents under the Eighth and Fourteenth Amendments of the United States Constitution, state

34

law,[1] and the Rehabilitation Act of 1973, 29 U. S. C. § 794, and entered a detailed remedial order requiring the eventual closing of Pennhurst in favor of community living arrangements for Pennhurst's displaced residents. 446 F. Supp. 1295 (ED Pa. 1978). On appeal, the Court of Appeals for the Third Circuit determined that the result reached by the District Court was proper under the Developmentally Disabled Assistance and Bill of Rights Act, 42 U. S. C. § 6000 et seq. (1976 ed. and Supp. III) (Act), although relief under that statute had not initially been raised in that court. 612 F. 2d 84 (1979) (en banc). The Court of Appeals determined that the Act created judicially cognizable rights to treatment and to receipt of care in the least restrictive environment, and that the right to treatment was also supported by state law. The court essentially affirmed the remedial order entered by the District Court with one significant exception.[2] Finding that the legislative history did not require the abandonment of large institutional facilities, the Court of Appeals held that the District Court erred in ordering Pennhurst to be closed. Rather, the Court of Appeals required that each resident of Pennhurst be afforded an individual hearing before a Special Master to determine the appropriate level of institutionalization with a presumption established that community-based living arrangements were proper.

In essence, the Court concludes that the so-called "Bill of Rights" section of the Act, 42 U. S. C. § 6010, merely serves to establish guidelines which States should endeavor to fulfill, but which have no real effect except to the extent that the Secretary of Health and Human Services chooses to use the criteria established by § 6010 in determining funding under the Act. In my view, this reading misconceives the impor-

---

[1] See Pa. Stat. Ann., Tit. 50, § 4201 et seq. (Purdon 1969).

[2] The Court of Appeals also overturned the District Court's decision to require the State to find suitable alternative employment for those Pennhurst employees displaced by the order. This order is not an issue before this Court.

tant purposes Congress intended § 6010 to serve. That section, as confirmed by its legislative history, was intended by Congress to establish requirements which participating States had to meet in providing care to the developmentally disabled. The fact that Congress spoke in generalized terms rather than the language of regulatory minutia cannot make nugatory actions so carefully undertaken.

I

As an initial matter, I agree that § 6010 was enacted pursuant to Congress' spending power, and not pursuant to its power under § 5 of the Fourteenth Amendment. Accordingly, I agree that the Act was not intended to place duties on States independent of their participation in the program established by the Act. The Court of Appeals, in the section of its opinion concerning the exercise of a private cause of action, determined that § 6010 was passed pursuant to § 5, reasoning that since the Fourteenth Amendment included a right " 'to be free from, and to obtain judicial relief for, unjustified intrusions on personal security,' " 612 F. 2d, at 98, quoting *Ingraham* v. *Wright,* 430 U. S. 651, 673 (1977), congressional passage of § 6010 indicated its desire to enforce this interest.[3]  Congressional action under the Enforcement Clause of the Fourteenth Amendment, however, has very significant consequences, see *Fitzpatrick* v. *Bitzer,* 427 U. S. 445 (1976), and given these ramifications, it should not be lightly assumed that Congress acted pursuant to its power under § 5 in passing the Act.

---

[3] Respondents Halderman and PARC suggest a number of other Fourteenth Amendment "interests" allegedly served by § 6010. See, *e. g., San Antonio Independent School Dist.* v. *Rodriguez,* 411 U. S. 1 (1973) (right to receive something more than no education); *Jackson* v. *Indiana,* 406 U. S. 715 (1972) (right to be institutionalized only when the nature and duration of such treatment bears a reasonable relation to its purpose); *O'Connor* v. *Donaldson,* 422 U. S. 563 (1975) (right of nondangerous persons capable of living without institutionalization to be free).

Here, there is no conclusive basis for determining that Congress acted pursuant to § 5. Nothing in the statutory language refers to the Fourteenth Amendment. Section 6010 was but one part of a bill whose underlying purpose was to extend and modify an existing federal-state grant program. The initial program was unquestionably passed pursuant to Congress' spending power. Moreover, § 6010 (3) is by its express terms a limitation on federal and state spending. The rights articulated in § 6010 are also cross-referenced in § 6063 (1976 ed. and Supp. III), which details the operation of the grant program.[4] Thus, all objective considerations connected with § 6010 and its operation suggest that Congress enacted it pursuant to its Spending Clause powers.

Of course, resolution of the § 5 issue does not determine the issue whether § 6010 was intended by Congress to have substantive consequences as part of a statute enacted under Art. I, § 8, cl. 1, and in my view, the majority makes far too much of the fact that § 6010 was not passed pursuant to the Fourteenth Amendment. While this conclusion has significant ramifications for the appropriate remedy for violations of the Act, it does not follow that § 6010 was to have no impact or effect besides the mere "encouragement" of state action and created no obligations on participating States and no rights in those being served by programs maintained by a State in cooperation with the Federal Government.

## II

The language and scheme of the Act make it plain enough to me that Congress intended § 6010, although couched in

---

[4] The Act as passed in 1975 required that the state plan "contain or be supported by assurances satisfactory to the Secretary that the human rights of all persons with developmental disabilities . . . be protected." § 6063 (b) (24). This measure was amended in 1978 to make it explicit that a State's plan must provide assurances of its compliance with § 6010. See text, *infra*.

terms of rights, to serve as requirements that the participating States must observe in receiving federal funds under the provisions of the Act. That Congress was deadly serious in stating that the developmentally disabled had entitlements which a State must respect if it were to participate in a program can hardly be doubted.

Federal involvement in state provision of health care to those persons with developmental disabilities began in 1963 with the passage of the Mental Retardation Facilities Construction Act, Pub. L. 88–164, 77 Stat. 282. That statute provided funds for the construction of health care facilities and specifically encouraged the development of community-based programs.[5] The Developmentally Disabled Act, technically an amendment to the Mental Retardation Facilities Construction Act, was passed in light of Congress' continued concern about the quality of health care being provided to the developmentally disabled and that federal support for improved care should be increased. A central expression of this concern was § 6010, which declares by way of four congressional "findings" that:

1. Persons with developmental disabilities have a "right to appropriate treatment, services, and habilitation."

2. Treatment should be designed to maximize an individual's potential and should be provided "in the setting that is least restrictive of the person's personal liberty."

3. The State and Federal Governments have an obligation to assure that public funds are not provided to institutions or programs that do not provide "appropriate treatment,

---

[5] An amendment was passed in 1967 which added a program to train professionals in community programs, as well as providing funds to support institutions, Pub. L. 90–170, 81 Stat. 527. In 1970, Congress passed a second amendment adopting a formula grant system essentially similar to the present system. The 1970 amendment also broadened the number of potential beneficiaries to include persons afflicted with various disabilities not previously covered. Pub. L. 91–517, 84 Stat. 1316.

services and habilitation" or do not meet minimum standards of care in six specific respects such as diet, dental care, and the use of force or chemical restraints.

4. Rehabilitative programs should meet standards designed to assure the most favorable possible outcome for patients, and these standards should be appropriate to the needs of those being served, depending on the type of institution involved.[6]

---

[6] The pertinent text of § 6010 provides:

"Congress makes the following findings respecting the rights of persons with developmental disabilities:

"(1) Persons with developmental disabilities have a right to appropriate treatment, services, and habilitation for such disabilities.

"(2) The treatment, services, and habilitation for a person with developmental disabilities should be designed to maximize the developmental potential of the person and should be provided in the setting that is least restrictive of the person's personal liberty.

"(3) The Federal Government and the States both have an obligation to assure that public funds are not provided to any institutional or other residential program for persons with developmental disabilities that—

"(A) does not provide treatment, services, and habilitation which is appropriate to the needs of such persons; or

"(B) does not meet the following minimum standards:

"(i) Provision of a nourishing, well-balanced daily diet to the persons with developmental disabilities being served by the program.

"(ii) Provision to such persons of appropriate and sufficient medical and dental services.

"(iii) Prohibition of the use of physicial restraint on such persons unless absolutely necessary and prohibition of the use of such restraint as a punishment or as a substitute for a habilitation program.

"(iv) Prohibition on the excessive use of chemical restraints on such persons and the use of such restraints as punishment or as a substitute for a habilitation program or in quantities that interfere with services, treatment, or habilitation for such persons.

"(v) Permission for close relatives of such persons to visit them at reasonable hours without prior notice.

"(vi) Compliance with adequate fire and safety standards as may be promulgated by the Secretary.

"(4) All programs for persons with developmental disabilities should

As clearly as words can, § 6010 (1) declares that the developmentally disabled have the right to appropriate treatment, services, and habilitation. The ensuing parts of § 6010 implement this basic declaration. Section 6010 (3), for example, *obligates* the Federal and State Governments not to spend the public funds on programs that do not carry out the basic requirement of § 6010 (1) and, more specifically, do not meet minimum standards with respect to certain aspects of treatment and custody. Sections 6010 (2) and (4) are phrased in less mandatory terms, but the former unmistakably states a preference for treatment in the least restrictive environment and the latter for establishing standards for assuring the appropriate care of the developmentally disabled in relation to the type of institution involved. Both sections, by delineating in some respects the meaning of "appropriate"

---

meet standards which are designed to assure the most favorable possible outcome for those served, and—

"(A) in the case of residential programs serving persons in need of comprehensive health-related, habilitative, or rehabilitative services, which are at least equivalent to those standards applicable to intermediate care facilities for the mentally retarded promulgated in regulations of the Secretary . . . as appropriate when taking into account the size of the institutions and the service delivery arrangements of the facilities of the programs;

"(B) in the case of other residential programs for persons with developmental disabilities, which assure that care is appropriate to the needs of the persons being served by such programs, assure that the persons admitted to facilities of such programs are persons whose needs can be met through services provided by such facilities, and assure that the facilities under such programs provide for the humane care of the residents of the facilities, are sanitary, and protect their rights; and

"(C) in the case of nonresidential programs, which assure the care provided by such programs is appropriate to the persons served by the programs."

Section 6010 was amended in 1978 to add the following concluding paragraph:

"The rights of persons with developmental disabilities described in findings made in this section are in addition to any constitutional or other rights otherwise afforded to all persons." Pub. L. 95–602, § 507, 92 Stat. 3007.

treatment, services, and habilitation, implement the basic rights that the developmentally disabled must be afforded for the purpose of the programs envisioned by the Act. Hence, neither section could be ignored by the Secretary in carrying out his duties under the statute.

Standing on its own bottom, therefore, § 6010 cannot be treated as only wishful thinking on the part of Congress or as playing some fanciful role in the implementation of the Act. The section clearly states rights which the developmentally disabled are to be provided as against a participating State. But § 6010 does not stand in isolation. Other provisions of the Act confirm the view that participating States must take account of § 6010 and that the section is an integral part of an Act cast in the pattern of extending aid conditioned on state compliance with specified conditions. Section 6063 (a) requires that for a State to take advantage of the Act, it must have a "plan submitted to and approved by the Secretary. . . ." Section 6063 (b) (1976 ed., Supp. III), which is entitled "Conditions for Approval," states that "[i]n order to be approved by the Secretary under this section, a State plan for the provision of services and facilities for persons with developmental disabilities must" be filed; and in its original form, § 6063 required the plan to satisfy the conditions stated in some 30 numbered paragraphs. The 24th specification was that the plan must "contain or be supported by assurances satisfactory to the Secretary that the human rights of all persons with developmental disabilities . . . who are receiving treatment, services, or habilitation under programs assisted under this chapter will be protected." Any doubts that the human rights referred to in § 6063 (b)(24) corresponded to those specified in § 6010 were removed in 1978 when § 6063 (b) was amended to restate the conditions which a plan must satisfy. Section 6063 (b)(5)(C) (1976 ed., Supp. III) now provides:

"The plan must contain or be supported by assurances satisfactory to the Secretary that the human rights of

all persons with developmental disabilities (especially those persons without familial protection) who are receiving treatment, services, or habilitation under programs assisted under this chapter will be protected consistent with section 6010 of this title (relating to the rights of the developmentally disabled)."

Pennsylvania has submitted a plan under § 6063, that is, a plan providing services for the developmentally disabled in Pennsylvania. The Court states that the plan has been approved and that funds have been allocated to the State. These funds will necessarily be supporting Pennsylvania's "programs" for providing treatment, services, or habilitation within the meaning of § 6063 (b)(5)(C); and under the express terms of that section, Pennsylvania is required to respect the § 6010 rights of the developmentally disabled in its state institutions, including Pennhurst, and to give the Secretary adequate assurances in this respect. This is true whether or not Pennhurst itself directly receives any share of the State's allocation. It should also be noted that § 6063 (b)(3)(A) (1976 ed., Supp. III) provides that "the funds paid to the state under § 6062 of this title will be used to make a significant contribution toward strengthening services for persons with developmental disabilities through agencies in the various political subdivisions of the State." Thus, funds received under the Act were intended to result in the improvement of care at institutions like Pennhurst.[7]

---

[7] There is nothing "curious" as the Court suggests about coming to a different conclusion about the applicability of § 6011 to Pennhurst. Section 6063 (b)(5)(B) requires that the plan must provide that services are provided in an individualized manner consistent with the requirements of § 6011 relating to habilitation plans. Section 6011 requires that when any specific program in a State, including any program of an agency, facility or project, receives funds from the State's allotment, it will have in effect individualized plans for habilitation of each individual receiving services under that program. The section goes on to specify in detail how such individualized plans shall be formulated and how they are to be car-

## III

The legislative history of § 6010 confirms the view that Congress intended § 6010 to have substantive significance. Both the initial House of Representatives and Senate versions of the Act contained provisions indicating congressional concern with the character and quality of care for the developmentally disabled. The House bill, H. R. 4005, 94th Cong., 1st Sess. (1975), did not have a bill of rights section akin to § 6010. It did, however, have a provision that required States to spend at least 10% of their respective allotments "for the purpose of assisting . . . in developing and implementing plans designed to eliminate inappropriate placement in institutions of persons with developmental disabilities." § 5 (b)(4). Debate in the House of Representatives indicated that the spending restriction was designed to promote community-based facilities to counteract the unfortunate practice of widespread institutionalization of developmentally disabled persons.[8]

---

ried out and monitored. The Court asserts that Pennhurst has not been receiving federal funds under the Act, which means, I take it, that Pennhurst has not received funds from the State's allocation under the Act. In that event, I would not think that § 6011 would apply to Pennhurst residents. But Pennhurst is part of the State's overall program, and the State has presented a plan and received federal funds to support its developmentally disabled program throughout the State. It must, therefore, observe the § 6010 rights of the developmentally disabled in state institutions, including Pennhurst.

[8] See, e. g., 121 Cong. Rec. 9976 (1975) (remarks of Cong. Rogers) (percentage requirement would assist in overcoming misuse of facilities caused by tendency of States to resort to institutionalization); ibid. (remarks of Cong. Carter) (treatment "should be conducted in that person's community without unnecessarily institutionalizing him").

It is clear that the House was concerned with many of the same factors which informed the Senate's detailed provision which ultimately lead to the genesis of § 6010. The Court's narrow reading of the House bill is not convincing. To the extent that the House bill did not have an analogue to § 6010, comments on the bill are necessarily irrelevant to the question of the intended effect of § 6010.

The Senate version of the Act, S. 462, 94th Cong., 1st Sess. (1975), contained a separate Title II, called the "Bill of Rights for Mentally Retarded and Other Persons with Developmental Disabilities," setting forth in extensive detail specific standards which state programs and facilities were required to meet. The impetus behind the Senate's "Bill of Rights" was the recognition by several Senators of the tragic conditions of confinement faced by many residents of large institutions.[9] An often repeated purpose of the Bill of Rights was to foster the development of community-based facilities as well as to encourage overall better care and treatment for the mentally disabled.[10] At the same time, there was the realiza-

---

[9] See, e. g., 121 Cong. Rec. 16518 (1975) (remarks of Sen. Javits) ("The shocking conditions at Willowbrook in New York, and many other institutions for the mentally retarded throughout the Nation which inspired the bill of rights have not ended"); id., at 16521 (remarks of Sen. Schweiker) ("The last 5 years have seen a dramatic increase in public awareness of the needs of institutionalized mentally retarded and developmentally disabled persons. This has been highlighted by scandals in many institutions, by court cases, and by the efforts of the communications media"); id., at 16516 (remarks of Sen. Williams) ("Over the past few years, the horrifying conditions which exist in most of the public residential institutions for the mentally retarded . . . have provided shocking testimony to the inhuman way we care for such persons. The conditions at . . . [the] institutions have shown beyond a shadow of a doubt that the treatment of these individuals is worse then [sic] all of us would like to admit").

[10] For example, Senator Javits stated that the Bill of Rights section, an integral part of the legislation, would "establish minimum standards for residential and community facilities and agencies for the protection of the rights of those individuals needing services, while at the same time, encouraging deinstitutionalization and normalization." Id., at 16518. In conclusion, Senator Javits identified a number of concerns shared by many of the legislators speaking on the Senate bill:

"Progress toward recognition of the basic human and civil rights of the mentally retarded and other developmentally disabled persons has been slow. The Federal Government has largely abrogated its responsibility in this regard and recently the greatest initiatives have come from our courts. . . .

"Congress should reaffirm its belief in equal rights for all citizens—

44

tion that institutions still had a significant role to play in the treatment of the mentally disabled.[11]

The Senate's version of Title II provided two methods for the States to comply with the requirements of the Act. First, a State wishing to participate could opt to follow guidelines to be established by the Secretary under Part B of Title II. § 210 (a). Alternatively, a State could decide to meet the extensive standards specified in Parts C and D relating to residential and community facilities respectively. Under the Senate bill, it was clear that the standards encompassed by the alternative procedures were not merely hortatory. That bill provided that within one year after the enactment, a State desiring funding must provide assurances to the Secretary that "each such facility or agency has established a plan for achieving compliance no later than 5 years after the date of enactment . . . ." § 203 (a). After the 5-

---

including the developmentally disabled. Congress should provide the leadership to change the tragic warehousing of human beings that has been the product of insensitive Federal support of facilities providing inhumane care and treatment of the mentally retarded. The bill of rights of S. 462 represents this new direction, and begins this reaffirmation." *Id.,* at 16519.

See *id.,* at 16520 (remarks of Sen. Cranston) (Senate bill enunciated basic goal of moving away from "long-term institutionalization of individuals with developmental disabilities to the development of community-based programs utilizing all community resources related to treatment or habilitation of such individuals to provide comprehensive services in the home community").

[11] See, *e. g., id.,* at 16522 (remarks of Sen. Schweiker) ("It is now time to provide alternatives to locking persons up in institutions"); *id.,* at 16520 (remarks of Sen. Cranston) ("[I]n encouraging the movement to community-based programs, I recognize that the need for some long-term residential programs will remain. The bill specifically provides that where institutional programs are appropriate, adequate support should be planned for them so that necessary treatment and habilitation programs can be given residential patients to develop their full potential"); *id.,* at 16516 (remarks of Sen. Stafford) (the Bill of Rights will "assist in the protection of the rights guaranteed under our Constitution for those individuals that will require institutionalization . . .").

year period, "no residential facility or program of community care for individuals with developmental disabilities shall be eligible to receive payments either directly or indirectly under any Federal law, unless such residential facility meets the standards promulgated under parts C or D of this title or has demonstrated to the Secretary for a reasonable period of time that it has actively implemented the requirements of part B." § 206 (a).

Following Senate and House passage, the different bills came to a Conference Committee. The resulting compromise kept the House 10% spending restriction which the Conference Report noted was "designed to eliminate inappropriate placement in institutions of persons with developmental disabilities . . . ." H. R. Conf. Rep. No. 94-473, p. 33 (1975). The Senate's detailed Bill of Rights was replaced by § 6010, a comparatively brief statement of the developmentally disabled's rights expressed in general terms. The specific mechanism of alternative compliance standards was omitted. The Conference Report set forth the following as the statement of purpose of the Conference version of the Senate's Title II.

"The conference substitute contains a compromise which enumerates Congressional findings respecting the rights of persons with developmental disabilities. These include findings that the developmentally disabled have a right to appropriate treatment, services and habilitation; that such treatment, services and habilitation should be designed to maximize the developmental potential of the person and be provided in the setting that is least restrictive to his personal liberty; that the Federal government and the States have an obligation to assure that public funds are not provided in programs which do not provide appropriate treatment, services and habilitation or do not meet minimum standards respecting diet, medical and dental services, use of restraints, visiting hours and compliance with fire and safety codes;

and that programs for the developmentally disabled should meet appropriate standards including standards adjusted for the size of the institutions . . . .

"These rights are generally included in the conference substitute in recognition by the conferees that the developmentally disabled, particularly those who have the misfortune to require institutionalization, have a right to receive appropriate treatment for the conditions for which they are institutionalized, and that this right should be protected and assured by the Congress and the courts." H. R. Conf. Rep. No. 94–473, *supra,* at 41–42.

Following the Conference Report, the Act was passed with minimal debate.[12]

The Senate's version of the Bill of Rights was hundreds of pages long and constituted an attempt to define the standards and conditions of state participation with precision and in great detail. The Conference Report makes clear that the detailed version was rejected, not to substitute a merely advisory section for an extended statement of conditions, but

---

[12] Prior to final passage, Congressman Rogers stated that the revised Title II included a "brief statement of the rights of the developmentally disabled to appropriate treatment and care," which constituted "modest *requirements." Id.,* at 29309 (emphasis added). Senator Javits was more dramatic in announcing the purpose of Title II as creating a clear federal policy in favor of a right to treatment. "This 'Bill of Rights' explicitly recognizes that the Federal Government and the States have an obligation to assure that public funds are not provided to institutions or other residential programs" that do not provide adequate treatment. *Id.,* at 29820. See also *id.,* at 29818 (remarks of Sen. Randolph) (compromise reorganized Title II of the Senate bill "in order to reflect the essential elements which are necessary for continued improvement in the quality of care and habilitation of developmentally disabled persons in residential and community facilities"); *id.,* at 29821 (remarks of Sen. Williams) (the compromise establishes for the first time in federal law a "basic statement" of the rights of the developmentally disabled and the Act "will assure that funds under the act will be used by the States to assist them in the deinstitutionalization process").

rather to substitute a generalized statement of entitlements that a participating State must respect and that would adequately meet congressional concerns without encountering the inflexibility of legislatively prescribed conditions of treatment and care. There is no basis for considering the shortened statement as intended to play a qualitatively lesser role in the scheme of the Act. Rather, the compromise is best understood as a rejection of either the need or the ability of Congress to specify the required standards in a manner resembling administrative regulations.[13]

## IV

As previously stated, § 6010 should be understood to require a State receiving funds under the Act to observe the rights established by the provision. None of the concerns expressed by the Court present sufficient reason to avoid or overcome the statutory mandate.

It is true that the terms "treatment, services and habilitation" to which § 6010 declares an entitlement are not self-defining. But it does not follow that the participating States are free to ignore them. Under § 6010 (3)(A), as already indicated, the State has an "obligation" not to spend public funds on any institutional or other residential facility that "does not provide treatment, services and habilitation which is appropriate to the needs of such persons." If federal

---

[13] The Act also required the Secretary to review and evaluate the quality standards under various statutes and to report to the Congress on any proposed changes. See Pub. L. 94–103, § 204, 89 Stat. 504. When the Secretary's recommendations were presented, the House took no steps to enact them into law, again demonstrating legislative unwillingness to adopt detailed uniform standards. See Developmental Disabilities Act Amendments of 1978: Hearings on H. R. 11764 before the House Committee on Interstate and Foreign Commerce, 95th Cong., 2d Sess., 471–475 (1978). Congress did determine, however, to amend § 6063 to expressly require a State to provide assurance to the Secretary of its plan to comply with § 6010. See 42 U. S. C. § 6063 (b)(5)(C) (1976 ed., Supp. III).

funds are to be used to support a program, the program must (1) provide for the § 6010 rights to appropriate treatment, services, and habilitation; (2) observe the direction in § 6010 (2) that treatment, services, and habilitation be furnished in the least restrictive setting; (3) satisfy the minimum standards referred to in § 6010 (3)(B); and (4) follow the provisions of § 6010 (4), which offers further guidance for the participating State in furnishing the treatment, services, and habilitation to which the developmentally disabled are entitled.

Furthermore, before approving a state plan, the Secretary must assure himself that the rights identified under § 6010 will be adequately protected by the participating State. Why the language of an express "condition," which § 6010 lacks, should be the only touchstone for identifying a State's obligation is difficult to fathom.[14] Indeed, identifying "rights" and requiring the participating State to observe them seems a far stronger indicia of congressional intent than a mere statement of "conditions."

To argue that Congress could not have intended to obligate the States under § 6010 because those obligations would

---

[14] None of the cases cited by the Court suggest, much less hold, that Congress is required to condition its grant of funds with contract-like exactitude. In *Harris* v. *McRae,* 448 U. S. 297 (1980), the Court held that there was no evidence in the statute or in *the legislative history,* that Congress intended the States to assume the full costs of funding abortions once the federal funds were withheld under the Hyde Amendment. Here, there is explicit recognition in the statute and in the legislative history that Congress intended the States to provide the developmentally disabled with adequate treatment in the least restrictive environment consistent with their medical needs. The other cases cited by the Court involved situations where the Court held that Congress must indicate that it intended the States to have waived fundamental constitutional rights merely by participating in a federal program. See *Edelman* v. *Jordan,* 415 U. S. 651 (1974) (Eleventh Amendment sovereign immunity); *Employees* v. *Department of Public Health,* 411 U. S. 279, 285 (1973) (same). The Eleventh Amendment concerns are not implicated in these cases, and the citation of *Edelman* and *Employees* is thus unpersuasive.

be large and for the most part unknown is also unpersuasive. Section 6010 calls for appropriate treatment, services, and habilitation; and, as already detailed, the remaining sections spell out, some in more detail than others, the scope of that requirement. Beyond this, however, the content and reach of the federal requirements will, as a practical matter, emerge from the process of preparing a state plan and securing its approval by the Secretary. The state plan must undertake to provide services and facilities pursuant to "standards" prescribed by the Secretary; and, as will become evident, the State's option to terminate its statutory duties must be respected by the courts. In any event, there is no indication in the record before us that the cost of compliance with § 6010 would be "massive." The District Court found that non-institutional facilities located in the communities would be significantly less expensive to operate than facilities like Pennhurst. 446 F. Supp., at 1312. At best, the cost of compliance with § 6010 is indeterminate.

It is apparently suggested that § 6010 is reduced to a mere statement of hope by the absence of an express provision requiring the Secretary to cut off funds in the event he determines that a State is not observing the rights set out in § 6010. But it is clear that the Secretary may not approve a plan in the first place without being assured that those rights will be protected, and it is difficult to believe that the Secretary must continue to fund a program that is failing to live up to the assurances that the State has given the Secretary.

It is also a matter of substantial moment that § 6012 (1976 ed., Supp. III) expressly conditions the approval of a plan on the State's providing "a system to protect and advocate the rights of persons with developmental disabilities," and that the system must "have the authority to pursue legal, administrative, and other appropriate remedies to insure the protection of rights of such persons." § 6012 (a)(2)(A). Section 6012 goes on to provide federal aid in establishing such sys-

tems, and it seems rather plain that the Act contemplates not only ongoing oversight by the Secretary but also enforcement of the rights of persons receiving treatment through judicial action or otherwise.

It is thus not of determinative significance that the Secretary was once of the view that noncompliance with § 6010 did not provide sufficient reason to cut off funds under the Act. As the Court recognizes, the 1978 amendments have convinced him that § 6010 rights must be respected;[15] but if the Secretary's original view was correct, and I do not think it was, this would not foreclose judicial remedies sought by or on behalf of developmentally disabled persons injured by the State's failure to observe § 6010 rights. Moreover, the Solicitor General, who is the legal representative of the United States, is of the view that the Act does create enforceable rights. In any event, this Court, as it is permitted to do, has disagreed on occasion with the administrative determination of the Secretary. See, *e. g., Philbrook* v. *Glodgett*, 421

---

[15] The Secretary has recently announced the Department's view that the rights enunciated by § 6010 must now be addressed by participating state plans as a result of the 1978 amendments. The explanation of the proposed rulemaking provided as follows:

"No authority was included in that Act to allow the Department to withhold funds from States on the basis of failure to meet the findings.

"The 1978 amendments, however, added a requirement to the basic State grant program that the State assure the Secretary that the rights of developmentally disabled people are to be protected consistent with [§ 6010]. The Department has decided to require that all programs authorized under the Act, except for the protection and advocacy systems, comply with [§ 6010] of the Act. The protection and advocacy systems are exempted because they are an extension of the 'Rights' provisions and the systems do not provide services, treatment or habilitation. The Department believes that applying this policy to the other programs is within the intent of Congress. Recipients of funds under the Act are to assure the State and the Commissioner that they will provide services which comply with the requirements of [§ 6010]. Failure to comply with the assurance may result in the loss of Federal funds." 45 Fed. Reg. 31006 (1980).

U. S. 707, 715, and n. 11 (1975); *Carleson* v. *Remillard,* 406 U. S. 598, 602 (1972); *Townsend* v. *Swank,* 404 U. S. 282, 286, and n. 3 (1971). See also *General Electric Co.* v. *Gilbert,* 429 U. S. 125, 140–146 (1976).

## V

Given my view that Congress intended § 6010 to do more than suggest that the States act in a particular manner, I find it necessary to reach the question whether these rights can be enforced in federal courts in a suit brought by the developmentally disabled. This action was brought under 42 U. S. C. § 1983, and directly under the Developmentally Disabled Act. The Court of Appeals determined that under the factors enunciated in *Cort* v. *Ash,* 422 U. S. 66 (1975), an implied private cause of action existed under the Act. Subsequently, however, we held that "the § 1983 remedy broadly encompasses violations of federal statutory as well as constitutional law." *Maine* v. *Thiboutot,* 448 U. S. 1, 4 (1980). It is acknowledged by all parties that it is appropriate to consider the cause-of-action question in light of the intervening decision in *Thiboutot.*

We have often found federal-court jurisdiction to enforce statutory safeguards in grant programs in suits brought by injured recipients. See, *e. g., Rosado* v. *Wyman,* 397 U. S. 397 (1970); *Shea* v. *Vialpando,* 416 U. S. 251 (1974); *Carleson* v. *Remillard, supra.* In essence, *Thiboutot* creates a presumption that a federal statute creating federal rights may be enforced in a § 1983 action. To be sure, Congress may explicitly direct otherwise, such as if the "governing statute provides an exclusive remedy for violations of its terms." *Thiboutot, supra,* at 22, n. 11 (POWELL, J., dissenting). See generally *Chapman* v. *Houston Welfare Rights Organization,* 441 U. S. 600, 672 (1979) (§ 1983 protections apply to all rights secured by federal statutes "unless there is clear indication in a particular statute that its remedial provisions are exclusive or that for various other reasons a § 1983 action is

inconsistent with congressional intention") (WHITE, J., concurring in judgment). Thus, in *Preiser* v. *Rodriguez,* 411 U. S. 475 (1973), we held that § 1983 did not provide a basis for relief since federal habeas corpus proceedings constituted the sole remedy for challenging the fact or duration of confinement. See *Adickes* v. *S. H. Kress & Co.,* 398 U. S. 144, 150, n. 5 (1970). Attempting to fit within the exception, the Pennhurst petitioners suggest that Congress intended the sole remedy for violations of the terms of the Act to be the power of the Secretary to disapprove a State's plan. See 42 U. S. C. § 6063 (c). According to these petitioners, imposition of a private remedy would be incompatible with the overall scheme of the Act, especially given the amorphous quality of the asserted rights.

As a general matter, it is clear that the fact that a federal administrative agency has the power to oversee a cooperative state-federal venture does not mean that Congress intended such oversight to be the exclusive remedy for enforcing statutory rights. This Court is "most reluctant to assume Congress has closed the avenue of effective judicial review to those individuals most directly affected by the administration of its program[s]" even if the agency has the statutory power to cut off federal funds for noncompliance. *Rosado* v. *Wyman, supra,* at 420. In part, this reluctance is founded on the perception that a funds cutoff is a drastic remedy with injurious consequences to the supposed beneficiaries of the Act. Cf. *Cannon* v. *University of Chicago,* 441 U. S. 677, 708, n. 42 (1979). In this litigation, there is no indication that Congress intended the funds cutoff, which, as the Court notes, the Secretary believed was not within the power of the agency, to be the sole remedy for correcting violations of § 6010. Indeed, § 6012 and the legislative history of the Act reveal that Congress intended judicial enforcement of § 6010. See *supra,* at 46; H. R. Conf. Rep. No. 94–473, p. 42 (1975) (the statutory rights established by § 6010 "should be protected and assured by the Congress and the courts"). Ac-

cordingly, I would hold that jurisdiction under § 1983 was properly invoked in these cases under *Thiboutot.*

## VI

I would vacate the judgment of the Court of Appeals and remand the cases for further proceedings. This litigation does not involve the exercise of congressional power to enforce the Fourteenth Amendment as the Court of Appeals held, but is an exercise of the spending power. What an appropriate remedy might be where state officials fail to observe the limits of their power under the United States Constitution or fail to perform an ongoing statutory duty imposed by a federal statute enacted under the commerce power or the Fourteenth Amendment is not necessarily the measure of a federal court's authority where it is found that a State has failed to perform its obligations undertaken pursuant to a statute enacted under the spending power. The State's duties in the latter situation do not arise until and unless the State chooses to receive federal funds. Furthermore, the State may terminate such statutory obligations, except those already accrued, by withdrawing from the program and terminating its receipt of federal funds. It is settled that administrative oversight and termination of federal funding in the event of a State's failure to perform its statutory duties is not the sole remedy in Spending Clause cases. "It is . . . peculiarly part of the duty of this tribunal, no less in the welfare field than in other areas of the law, to resolve disputes as to whether federal funds allocated to the States are being expended in consonance with the conditions that Congress has attached to their use." *Rosado* v. *Wyman, supra,* at 422–423. It is equally clear, however, that the courts in such cases must take account of the State's privilege to withdraw and terminate its duties under the federal law. Although the court may enjoin the enforcement of a discrete state statutory provision or regulation or may order state officials prospectively to perform their duties incident to the

receipt of federal funds, the prospective force of such injunctions cannot survive the State's decision to terminate its participation in the program. Furthermore, there are cases in which there is no identifiable statutory provision whose enforcement can be prohibited. *Rosado* v. *Wyman* was such a case, and there, after finding that the State was not complying with the provisions of the Social Security Act, we remanded the case to the District Court to "afford [the State] an opportunity to revise its program in accordance with [federal requirements]" as we had construed them to be, but to retain jurisdiction "to review . . . any revised program adopted by the State, or, should [the State] choose not to submit a revamped program by the determined date, issue its order restraining the further use of federal monies . . . ." 397 U. S., at 421–422. See *Lau* v. *Nichols*, 414 U. S. 563 (1974).

It is my view that the Court of Appeals should have adopted the *Rosado* approach in these cases. It found the State to be in noncompliance with the federal statute in major respects and proceeded to impose a far-reaching remedy, approving the appointment of a Special Master to decide which of the Pennhurst inmates should remain and which should be moved to community-based facilities. More properly, the court should have announced what it thought was necessary to comply with the Act and then permitted an appropriate period for the State to decide whether it preferred to give up federal funds and go its own route. If it did not, it should propose a plan for achieving compliance, in which event, if it satisfied the court, a decree incorporating the plan could be entered and if the plan was unsatisfactory, the further use of federal funds could be enjoined. In any event, however, the court should not have assumed the task of managing Pennhurst or deciding in the first instance which patients should remain and which should be removed. As we recently recognized in *Parham* v. *J. R.*, 442 U. S. 584 (1979): "The mode and procedure of medical diagnostic procedures is not the business of judges. What is best for a

child is an individual medical decision that must be left to the judgment of physicians in each case. We do no more than emphasize that the decision should represent an independent judgment of what the child requires and that all sources of information that are traditionally relied on by physicians and behavioral specialists should be consulted." *Id.,* at 607–608. Cf. *Addington* v. *Texas,* 441 U. S. 418, 429 (1979) (commitment depends "on the *meaning* of the facts which must be interpreted by expert psychiatrists and psychologists"). In enacting § 6010, Congress eschewed creating any specific guidelines on the proper level of institutionalization, leaving the question to the States to determine in the first instance. A court-appointed Special Master is inconsistent with this approach.

Accordingly, I would vacate the judgment of the Court of Appeals and remand the cases for further proceedings.