*580 HALL, Circuit Judge,
dissenting:
I join Judge Murnaghan’s dissenting opinion. I write separately, however, to set forth an alternative basis for affirming the Secretary’s decision.
If the statute in question is ambiguous, as a majority of the court apparently assumes it to be, I would agree with the majority that “[wjhether [Judge Murnaghan’s] interpretation of the statute or that which [the majority] believe[s] Congress intended is the better [] is not even the question.” 86 F.3d at 1352. I would, however, disagree with the majority’s view that “the deference that we ordinarily afford agency interpretations of ambiguous statutes is inapplicable in a case such as this.” Id. at 1351 n. 4. There are lots of “case[s] such as this” that involve complex funding programs and millions of federal dollars. In the wake of our decision today, the role of the agencies to whom Congress has assigned the task of administering these programs is an uncertain one.
I believe that a majority of the court would agree that Congress could, provided it did so expressly, condition a State’s receipt of funds under the IDEA cooperative funding program on the State’s continuing to provide educational services to disabled students expelled for reasons unrelated to their disabilities. See South Dakota v. Dole, 483 U.S. 203, 207, 107 S.Ct. 2793, 2796, 97 L.Ed.2d 171 (1987) (“In considering whether a particular expenditure is intended to serve general public purposes, courts should defer substantially to the judgment of Congress.”). The statutory provision in question, 20 U.S.C. § 1412(l), is arguably not an unambiguous expression of Congressional intent that such services be provided. The issue, then, is whether we will require that Congress itself define in unmistakable statutory terms each and every string that is or may ever be attached to a State’s receipt of funds under a cooperative funding program, or do we defer to a reasonable interpretation made by the federal agency to which Congress has delegated the job of operating the program? In choosing the former, the majority eviscerates the rule of Chevron and establishes a “clear statement rule” that is as unprecedented as it is unworkable.
The majority’s holding and the essential analysis supporting it are contained in the first paragraph of part I-B of its opinion: When Congress wants to condition the States’ receipt of funds, it must do so in “unmistakably clear terms” in the statute. 86 F.3d at 1352. This “clear statement” rule is derived from Pennhurst State School and Hospital v. Halderman, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981), a pre-Chevron decision that had the following to say about the need for a State to know what it is agreeing to when it enters into the cooperative funding scheme:
[Legislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions. The legitimacy of Congress’ power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the “contract.” ... [I]f Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously.
Id. at 17, 101 S.Ct. at 1540 (citations omitted). Applying this general rule in the manner advanced by the majority takes Penn-hurst to an unintended level.
In its discussion of the Spending Clause, the Court in Pennhurst was concerned that a State know what was expected of it when it chose to participate in a federal funding program. Id. at 17-18, 101 S.Ct. at 1540. Pennhurst simply does not stand for the proposition that every detail of a federal-state cooperative funding program must be spelled out in the statute itself, and we have not so held in the sixteen years since Penn-hurst was decided. Indeed, the Supreme Court has recently deferred to the Secretary’s interpretation of an IDEA provision in a situation analogous to the one before us. See Honig v. Doe, 484 U.S. 305, 325 n. 8, 108 S.Ct. 592, 605 n. 8, 98 L.Ed.2d 686 (1988) (“Given this ambiguity [in the phrase ‘change in placement’ used in 20 U.S.C. § 1415(e)(3) ], we defer to the construction adopted by the agency charged with monitoring and enforcing the statute.”) (citing INS v. *581 Cardozo-Fonseca, 480 U.S. 421, 448, 107 S.Ct. 1207, 1221, 94 L.Ed.2d 434 (1987)).
The IDEA gives to the Secretary of Education the authority to administer, interpret and enforce the statute. See 20 U.S.C. §§ 1402(a), 1416, 1417(b). The Secretary’s interpretive rule in this case—that even children expelled for misbehavior unrelated to their disabilities be provided educational services—was published well before Virginia submitted its application for participation in the program for fiscal years 1993-95. See Metropolitan School Dist. of Wayne Township v. Davila, 969 F.2d 485 (7th Cir.1992) (discussing the history of the interpretive rule), cert. denied, 507 U.S. 949, 113 S.Ct. 1360, 122 L.Ed.2d 740 (1993). Virginia pursued the benefits of IDEA funding with its eyes wide open. Pennhurst does not suggest that this court should now abrogate those conditions of which Virginia was aware solely because such condition was not precisely spelled out in the few pages of the United States Code that established this sizable government program.
An example from another federal-state funding program will serve to show the unworkability of the majority’s rule. At issue in Rehabilitation Ass’n of Virginia, Inc. v. Kozlowski, 42 F.3d 1444 (4th Cir.1994), cert. denied, — U.S. —, 116 S.Ct. 60, 133 L.Ed.2d 23 (1995), was the meaning of the Medicaid and Medicare statutes’ formula for a State’s contribution for services to persons eligible under both programs. Acknowledging that Chevron would apply if the statute were ambiguous, id. at 1450, two judges on the panel nevertheless rejected the Secretary of HHS’s interpretation and instead adopted an interpretation that they found to be in accord with the clear and unambiguous language of the statute. The concurring opinion, however, provides a glimpse of what the future may hold if Chevron deference is replaced by the clear statement rule adopted by the majority in our case.
After concluding that there was more than one reasonable interpretation of the statutes in question, Judge Niemeyer invoked Chevron to support his view that the court should defer to the federal agency’s interpretation. Id. at 1470-71 (Niemeyer, J., concurring in part and dissenting in part). Had the Secretary’s interpretation in Kozlowski been the one that mandated increased contributions from the States, we can only wonder how the analysis would have proceeded under the rule announced by the majority in the case before us. Given two reasonable interpretations of a statute, each of which would “condition the State’s receipt of federal funds in a particular manner” in the context of a cooperative federal-state funding program, but which would yield different results as far as the financial effect on the participating State, does this very ambiguity ipso facto defeat the federal government’s claim that its interpretation should be adopted? Should the courts, faced with an ambiguity, always defer to the interpretation advanced by the State? What effect, if any, does the type of program or amount of money involved have on the analysis? For example, should the courts accord some deference to the Secretary of Transportation with regard to ambiguities in highway-funding statutes, but none whatsoever to the Secretary of Education?
We should not allow the visceral impact of the case before us—unruly and even dangerous students threatening the fabric of our schools and the physical integrity of our children—to disguise the portent of the majority’s analysis or to cause us to forsake the established rule that we defer to reasonable agency interpretations of the statute.
When a challenge to an agency construction of a statutory provision, fairly conceptualized, really centers on the wisdom of the agency’s policy, rather than whether it is a reasonable choice within a gap left open by Congress, the challenge must fail.
Chevron, 467 U.S. at 866, 104 S.Ct. at 2793. Congress necessarily delegated to the Secretary the authority to administer the IDEA because not every aspect of such a program can be adequately addressed in a statute. The majority’s rule will require that the minutiae of cooperative funding programs be *582 spelled out in the statute itself, bringing to mind Justice White’s complaint in Pennhurst that “[n]one of the cases cited by the Court suggest, much less hold, that Congress is required to condition its grant of funds with contract-like exactitude.” 451 U.S. at 48 n. 14,101 S.Ct. at 1555 n. 14 (White, J., dissenting in part).
Our views on the educational and disciplinary policies implicated by the IDEA are irrelevant to the issue at hand. Judge Luttig sets out the case for why the State’s interpretation is good policy—everyone should be treated alike when it comes to discipline, 86 F.3d at 1357—and Judge Murnaghan presents the federal government’s argument that it is sound policy to provide unbroken services to disabled children even when they are expelled for behavior unrelated to their disability. Ante at 575-79 (Murnaghan, J., dissenting). But as long as the goal of the federal legislation—the education of disabled children—is a proper one (as it most certainly is), and as long as the means selected—the provision of services to expelled students—is rationally related to that goal (as Judge Mur-naghan’s opinion demonstrates it is), our task is at an end.*
I would affirm the decision of the Secretary.

 To bolster its "clear statement” holding, the majority notes that insistence on an unambiguous statutory expression of a condition on the receipt of funds is "especially important where, as here, the claimed condition requires the surrender of one of, if not the most significant of, the powers or functions reserved to the States by the Tenth Amendment.” 86 F.3d at 1352. By choosing to accept federal IDEA funding, Virginia certainly “surrendered” a large degree of its "powers and functions” relative to the education of its children. I do not, however, see the majority’s discussion of the Tenth Amendment and the clear statement rule in Gregory v. Ashcroft, 501 U.S. 452, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991), as essential to the majority’s holding.