OFFICE OF THE ATTORNEY GENERAL · STATE OF TEXAS



December 29, 1999

Mr. Vernon M. Arrell
Commissioner
Texas Rehabilitation Commission
4900 North Lamar Boulevard
Austin, Texas 78751-2399

Opinion No. JC-0161

Re: Whether the Texas Council for Developmental Disabilities may engage in lobbying activities (RQ-0085-JC)

Dear Mr. Arrell:

You ask whether the Texas Council for Developmental Disabilities may engage in lobbying activities after an organization subordinate to it, the Traumatic Brain Injury Advisory Board, begins to receive funds appropriated by the legislature.[1] We conclude that for purposes of the lobbying restrictions in the General Appropriations Act and chapter 556 of the Government Code, the Texas Council for Developmental Disabilities is a state agency that uses both federal and state funds, and that it may not use funds from either source to attempt to influence the passage or defeat of a legislative measure.

The General Appropriations Act for the current biennium provides that "[t]he moneys appropriated by this Act, regardless of source or character, may not be expended except in compliance with Chapter 556, Government Code." Act of May 28, 1999, 76th Leg., R.S., ch. 1589, art. IX, § 9-4.05, 1999 Tex. Sess. Law Serv. 5447, 6269 [hereinafter "General Appropriations Act"]. Chapter 556 of the Government Code prohibits a state agency from using appropriated money to lobby for or against legislation:

(a) A state agency may not use appropriated money to attempt to influence the passage or defeat of a legislative measure.

(b) This section does not prohibit a state officer or employee from using state resources to provide public information or to provide information responsive to a request.

---

[1] The Texas Council for Developmental Disabilities has repealed Council rules relating to the Traumatic Brain Injury Advisory Board "because funding for the Traumatic Brain Injury Board has expired and operations of the Board have ceased." 24 Tex. Reg. 10900, 10901 (Dec. 3, 1999). Nevertheless, because the status of the Board's existence is uncertain, we answer your question as if the Board is still in operation.

TEX. GOV'T CODE ANN. § 556.006 (Vernon Supp. 2000). If the Texas Council for Developmental Disabilities is a state agency that uses appropriated money, regardless of source or character, it may not use that money to influence the passage or defeat of a legislative measure.

A "state agency" for purposes of chapter 556 includes "a department, commission, board, office, or other agency in the executive branch of state government, created under the constitution or a statute, with statewide authority." *Id.* "Appropriated money" means "money appropriated by the legislature through the General Appropriations Act or other law." *Id.* We must determine whether the Council is a "state agency" and whether it uses "appropriated money."

The Texas Council for Developmental Disabilities ("the Council") was established by Texas law for the purpose of receiving federal funds to assist individuals with developmental disabilities. The federal Developmental Disabilities Assistance and Bill of Rights Act of 1996, and its predecessors, sets up a program for providing funds to states to assist individuals with developmental disabilities. *See* 42 U.S.C. § 6000 (1994). A state that wishes to receive federal funds must establish a state developmental disabilities council. *Id.* §§ 6022(c)(1), 6024(a). The mission of a state council is "to promote, through systemic change, capacity building, and advocacy activities . . . the development of . . . services, supports, and other assistance designed to achieve independence, productivity, and integration and inclusion into the community for individuals with developmental disabilities." *Id.* § 6021. In particular, a council is authorized to undertake such activities as community outreach, training, public education, disabilities prevention, and a number of other activities set out by the federal law. *Id.* § 6024(c)(4)(A)-(K). In Texas, the Texas Council for Developmental Disabilities is the entity that has been established to implement the purposes of the federal act. *See* TEX. HUM. RES. CODE ANN. § 112.011 (Vernon 2000). State law confers powers and duties upon the Council in addition to its responsibilities under federal law. *Id.* § 122.020.

The Traumatic Brain Injury Advisory Board ("TBI Advisory Board") is another entity created to take advantage of federal funds for the purpose of assisting persons with disabilities. The federal Traumatic Brain Injury Act of 1996 authorizes the United States Department of Health and Human Services to make grants to states for the purpose of improving access to health and other services for victims of traumatic brain injury. *See* 42 U.S.C. § 300d-52(a) (Supp. II 1994). To receive a federal grant, a state must establish an advisory board within the state health department or within another state agency as determined by the governor. *Id.* § 300d-52(b)(1). The advisory board must, among other things, make recommendations to the state on ways to improve services coordination regarding traumatic brain injury. *Id.* § 300d-52(b)(2). Governor Bush appointed the Council as the lead agency charged with coordinating the planning and development efforts of the state advisory board with the goal of obtaining a federal grant. *See* Letter from Honorable George W. Bush, Governor, State of Texas, to Ms. Jan Newsom, Chair, Texas Planning Council for Developmental Disabilities (Feb. 6, 1997) (on file with Opinion Committee). After the grant was awarded, the TBI Advisory Board was established in Texas to fulfill the purposes of the federal law. *See* 22 Tex. Reg. 9187, 9188 (Sept. 12, 1997), *repealed by* 24 Tex. Reg. 10900, 10901 (Dec. 3, 1999).

While the Council acts as the administrative supporter of the TBI Advisory Board, the Council itself receives administrative support and fiscal management services from the Texas Rehabilitation Commission for its activities with respect to individuals with developmental disabilities. The federal Developmental Disabilities Assistance and Bill of Rights Act of 1996 requires a state that establishes a developmental disabilities council and receives federal funds under the Act to designate a state agency "that shall, on behalf of the State, provide support to the Council." 42 U.S.C. § 6024(d)(1) (1994). The Texas Rehabilitation Commission was appointed by Governor Clements in 1983 to serve as what was then called the "administering agency" for the Council. See HOUSE RESEARCH ORG., BILL ANALYSIS, Tex. H.B. 1610, 76th Leg., R.S. 2 (Apr. 6, 1999). A 1994 amendment to the federal law allows a state to appoint a council itself as the designated state agency, see 42 U.S.C. § 6024(d)(1) (1994), although Texas has chosen to have the Rehabilitation Commission continue to serve that role. Among other duties, the designated agency shall provide "support services" as requested by and negotiated with the Council, "receive, account for, and disperse funds" received under the Act, and "provide for such fiscal control and fund accounting procedures as may be necessary to assure the proper disbursement of, and accounting for, funds paid to the State" under the Act. Id. § 6024(d)(3); see TEX. HUM. RES. CODE ANN. §§ 112.001(2), .018 (Vernon Supp. 2000).

We conclude that the Texas Council for Developmental Disabilities is a state agency for purposes of chapter 556 of the Government Code. A "state agency" for purposes of chapter 556 includes "a department, commission, board, office, or other agency in the executive branch of state government, created under the constitution or a statute, with statewide authority." TEX. GOV'T CODE ANN. § 556.001 (Vernon Supp. 2000). The Council was created by statute. See TEX. HUM. RES. CODE ANN. § 112.011 (Vernon Supp. 2000). Its members are appointed by the governor, id. § 112.012, and they must be trained on the requirements of the state open meetings law, public information law, administrative procedures law, conflict of interest law, and other laws relating to public officials, id. § 112.0163(b). The Council is subject to the Texas Sunset Act. Id. § 112.023. It has rulemaking authority, id. § 112.020(b), and statewide authority to advocate on behalf of persons with developmental disabilities and to perform other duties imposed by state and federal law, id. § 112.019. These factors have supported findings by courts and this office that an entity is a state agency. See, e.g., American Home Assurance v. Texas Dep't of Ins., 907 S.W.2d 90, 95 (Tex. App.–Austin 1995, writ denied); Tex. Att'y Gen. Op. No. H-1116 (1978) at 1.

The Texas Ethics Commission determined in 1992 that the Council was not a "state agency" for purposes of former article 6252-9b of the Texas Civil Practices and Remedies Code, now codified in chapter 572 of the Government Code, which requires state officers to file personal financial statements with the Ethics Commission. See Tex. Ethics Comm'n Op. No. 26 (1992); TEX. GOV'T CODE ANN. §§ 572.002, .021 (Vernon 1994 & Supp. 1999). Chapter 572 defines "state agency" to include "a department, commission, board, office, or other agency that . . . is in the executive branch of state government; has authority that is not limited to a geographical portion of the state; and was created by the Texas Constitution or a statute of this state." Id. § 572.002(10) (Vernon Supp. 2000). The ethics opinion reasons that because the definition requires an entity to wield actual "authority," an entity that does not wield actual authority is not a "state agency" for

purposes of the financial reporting requirement. Tex. Ethics Comm'n Op. No. 26 (1992). Chapter 556 of the Government Code, the current state agency lobbying prohibition, similarly defines a "state agency" as an entity that has statewide "authority." TEX. GOV'T CODE ANN. § 556.001 (Vernon Supp. 2000). The ethics opinion concludes that the Council is an advisory body and does not exercise actual "authority" because the Council "does not provide services, does not distribute funds, does not implement policy, and does not engage in adjudication." Tex. Ethics Comm'n Op. No. 26 (1992).

The authority of the Council has changed since the ethics opinion was issued in 1992. Recent amendments to state laws governing the Council have increased its authority and its independence, apart from administrative support and fiscal management, from the Texas Rehabilitation Commission, bringing the Council's duties in line with previous changes made to federal law. *See* Sunset Advisory Comm'n Report, at 126 (Sept. 1998); HOUSE RESEARCH ORG., BILL ANALYSIS, Tex. H.B. 1610, 76th Leg., R.S. 3 (Apr. 6, 1999). The role of the Rehabilitation Commission was changed from one of "administering" the Council to one of providing "support" to the Council. TEX. HUM. RES. CODE ANN. §§ 112.001(2), .018(a) (Vernon Supp. 2000). While the Commission receives and disburses Council funds, *id.* § 112.018(b), the Commission no longer makes the final decision regarding the award of grants, *id.* § 112.018(c). The Council may now adopt rules as necessary to implement its duties, approve and execute an annual budget for Council activities, and contract with or provide grants to agencies, organizations, and individuals as necessary to implement Council activities. *Id.* § 112.020(b). In our view, these powers and duties confer "authority" upon the Council and make it a "state agency" for purposes of chapter 556 of the Government Code. Accordingly, the Council may not engage in lobbying if it uses "appropriated money."

Chapter 556 defines appropriated money as "money appropriated by the legislature through the General Appropriations Act or other law." TEX. GOV'T CODE ANN. § 556.001 (Vernon Supp. 2000). The General Appropriations Act prohibits the use for lobbying of appropriated monies "regardless of source or character." General Appropriations Act, *supra*, art. IX, § 9-4.05, at 6269. On their face, these definitions encompass both funds that originated in the state and funds received from the federal government for appropriation to state agencies. Federal funds received by the state must be deposited in the state treasury, and may be withdrawn only by appropriation. *See* TEX. GOV'T CODE ANN. § 404.094 (Vernon 1998); TEX. CONST. art. VIII, § 6; Tex. Att'y Gen. Op. Nos. DM-288 (1994) at 2; JM-772 (1987) at 6-7. The General Appropriations Act appropriates federal funds received from state agencies to such agencies for the purposes for which the funds were granted. *See* General Appropriations Act, *supra*, art. IX, § 9-8.02, at 6305. Thus, chapter 556 prohibits both federal funds and state funds appropriated by the legislature from being used for lobbying activities. *Cf.* Tex. Att'y Gen. Op. No. MW-191 (1980) 1 (stating that federal funds appropriated to Texas Prosecutors Coordinating Council through the general appropriations act were subject to riders limiting the use of appropriated funds).

Although the Council receives no direct appropriations of state funds, *see* Sunset Advisory Comm'n Report, at 126 (Sept. 1998), it uses federal funds, uses the resources of a state-funded

agency, and coordinates state funds used by another state entity. Federal funds received by the state for the Council's use are deposited in the state treasury and appropriated to the Texas Rehabilitation Commission, which provides administrative support and fiscal management services to the Council. *See* General Appropriations Act, *supra*, art. II, at 5652; TEX. HUM. RES. CODE ANN. §§ 112.001(2), .018 (Vernon Supp. 2000). Federal law requires that there be state financial participation in Council activities. *See* 42 U.S.C. § 6022(5)(B) (1994). Additionally, the current appropriations act allocates $20,000 in state funds to the TBI Advisory Board, whose efforts, as we have said, are coordinated by the Council. *See* General Appropriations Act, *supra*, art. II, at 5653. Thus, we conclude that the Council uses both state and federal funds.

Although we have concluded that federal funds that pass through the state's general appropriations act for use of the Council are "appropriated money" for purposes of chapter 556 of the Government Code, we must nevertheless determine whether federal funds granted to the state pursuant to the federal Developmental Disabilities Assistance and Bill of Rights Act fall within the reach of state lobbying prohibitions. As a general rule, if federal law requires that federal funds granted to a state be used for a particular purpose, that requirement attaches to the funds in the state treasury, and the legislature is bound by any such requirement in appropriating the funds. *See* Tex. Att'y Gen. Op. No. DM-145 (1992) at 3. "There is of course no question that the Federal Government, unless barred by some controlling constitutional prohibition, may impose the terms and conditions upon which its money allotments to the States shall be disbursed, and that any state law or regulation inconsistent with such federal terms and conditions is to that extent invalid." *King v. Smith*, 392 U.S. 309, 333 (1968). States are free to refuse grants of federal funds, but if the funds are accepted, the state must comply with the conditions attached to their receipt. *See Gieseking v. Schafer*, 672 F. Supp. 1249, 1255 (W.D. Mo. 1987) ("As with other federal-state cooperative programs, the [Developmental Disabilities] Act is voluntary, and states are given the choice of complying with the conditions set forth in the Act or foregoing the benefits of federal funding."); Tex. Att'y Gen. Op. No. MW-395 (1981) at 4.

But federal funds granted to a state are not necessarily free from the application of all state laws. Attorney General opinions have upheld the application of state laws to the use of federal funds on the grounds that the funds become state funds when they are deposited in the state treasury and appropriated by the legislature. *See, e.g.*, Tex. Att'y Gen. Op. Nos. JM-118 (1983) at 2 (concluding that teachers who worked under federally funded program were subject to constitutional prohibition on dual compensation); MW-191 (1980) at 1 (concluding that federal funds appropriated to Texas Prosecutors Coordinating Council through general appropriations act were subject to rider restricting use of outside legal counsel). Another opinion upheld the application of state laws to federal funds where federal law required that the funds be spent in accordance with state law. *See* Tex. Att'y Gen. Op. No. DM-331 (1995) at 2 (concluding that federal block grant funds distributed to city are subject to state competitive bidding laws).

The United States Supreme Court has said that when Congress acts pursuant to its spending power, its legislation is like a contract. In return for federal funds, the states agree to comply with federally imposed conditions. *See Davis v. Monroe County Bd. of Educ.*, ___ U.S. ___, 119 S. Ct.

1661, 1670 (1999). In interpreting language in spending legislation, the Court requires Congress to "speak with a clear voice," since there can be no knowing acceptance of the terms of a putative contract if a state is unaware of the conditions imposed by federal law or is unable to ascertain what is expected of it. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). Thus, the Court has said that if Congress intends to impose a condition on the grant of federal funds, thereby tying the hands of the state legislature to some extent, it must do so unambiguously. *Id.*

While we have found no Texas court opinion that has directly addressed the issue of the state's authority to restrict the use of federal funds, Attorney General Opinion JM-772 applies a test similar to the one used by the United States Supreme Court. Attorney General Opinion JM-772 concludes that the test for determining whether federal law controls a state's use of funds is "whether there is a clear manifestation of congressional intent to alter states' traditional decision-making processes." Tex. Att'y Gen. Op. No. JM-772 (1987) at 12. Applying this test, the opinion concluded that the principles of law governing the allocation and appropriation of state funds were applicable to federal funds received by the state in a certain settlement of litigation. *Id.* at 13.

We do not find that the federal law pursuant to which the Council receives federal funds clearly manifests an intent that the funds be free of state lobbying restrictions or, for that matter, that the funds be used for lobbying at all. Under the Developmental Disabilities Assistance and Bill of Rights Act of 1996, state councils are directed to "serve as an advocate for individuals with developmental disabilities," 42 U.S.C. § 6024(c)(1), and assist disabled individuals through "systemic change, capacity building, and advocacy activities." *Id.* § 6021. The federal statute lists a number of activities in which a council may engage in furtherance of its mission. *See id.* § 6024(c)(4)(A)-(K). These activities include outreach, training, public education, and "provid[ing] information to Federal, State, and local policymakers, including the Congress, the Federal executive branch, the Governor, State legislature, and State agencies." *Id.* § 6024(c)(4)(B), (C), (H), (I).

It is true that "advocacy" activities and "providing information" to the legislature might be construed as encompassing attempts to influence the passage or defeat of legislation. But in our view both of these things, as well as the other activities recommended by the federal statute, could be accomplished without engaging in activities that rise to the level of lobbying. Federal law does not clearly require a state to use federal funds to engage in lobbying, nor does it clearly restrict a state's authority to prohibit the use of federal funds for lobbying. Furthermore, chapter 556 of the Government Code "does not prohibit a state officer or employee from using state resources to provide public information or to provide information responsive to a request." TEX. GOV'T CODE ANN. § 556.006 (Vernon Supp. 2000). Thus, the Council could provide information to the legislature, in furtherance of its duties under federal law, without violating the state lobbying prohibition.

Accordingly, we conclude that federal funds received by the state and appropriated for the use of the Texas Council for Developmental Disabilities pursuant to the federal Developmental Disabilities Assistance and Bill of Rights Act are subject to the lobbying restrictions of the state

General Appropriations Act and chapter 556 of the Government Code. Consequently, the Council may use neither federal funds nor state funds to attempt to influence the passage or defeat of a legislative measure.

## S U M M A R Y

The Texas Council for Developmental Disabilities is a state agency that uses money appropriated by the Legislature. In accordance with the lobbying restrictions of the General Appropriations Act and chapter 556 of the Government Code, the Council may use appropriated money to provide information to policymakers or to provide information responsive to a request from policymakers. The Council may not, however, use appropriated money to influence the passage or defeat of any legislative measure.

Yours very truly,

JOHN CORNYN
Attorney General of Texas

ANDY TAYLOR
First Assistant Attorney General

CLARK KENT ERVIN
Deputy Attorney General - General Counsel

ELIZABETH ROBINSON
Chair, Opinion Committee

Barbara Griffin
Assistant Attorney General - Opinion Committee